T.C. Memo. 2001-75

UNITED STATES TAX COURT

JOHN E. WALL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JOANNE WALL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 1590-98, 1850-98.          Filed March 27, 2001.

These are gift tax valuation cases in which the transferred property is nonvoting common stock of a family corporation given by petitioners to 20 trusts for their 10 children. The value per share determined by the statutory notices exceeded the value claimed in the gift tax returns by only 17 percent. The reports prepared by the experts for trial came up with values that widened the gap between the parties' initial positions. In <u>Buffalo Tool & Die Manufacturing Co. v. Commissioner</u>, 74 T.C. 441, 451-452 (1980), the Court suggested that valuation cases should be settled, and warned the parties that in some cases the Court might be persuaded to adopt the position of one party, rather than to split the difference between their positions; these are such cases. <u>Held</u>: the determination of value in the statutory notices is sustained.

Rex A. Guest and Melvin L. Katten, for petitioners.

Michael F. O'Donnell and George W. Bezold, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, Judge:  Respondent determined a $73,789 deficiency in petitioner John E. Wall's gift tax for calendar 1992.  Respondent also determined a $73,789 deficiency in the 1992 gift tax of Mr. Wall's spouse, petitioner Joanne Wall.  Mrs. Wall is a party to these consolidated cases solely because petitioners elected to treat Mrs. Wall as the donor of one-half of the gifts Mr. Wall made during 1992.  See sec. 2513.[1]

The only issue for decision is the fair market value, as of January 1, 1992, of 9,380 shares of Demco, Inc., nonvoting common stock, which Mr. Wall gave on that date to 20 trusts for the benefit of his children.  Petitioners claimed on their gift tax returns that the fair market value of the stock was $221.75 per share.  Respondent asserted in the statutory notices that the correct value was $260.13 per share, approximately 17 percent more than the value claimed by petitioners.

---

[1] All section references are to the Internal Revenue Code in effect for 1992, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise specified.

## FINDINGS OF FACT

Petitioners resided in Madison, Wisconsin, when they filed the petitions in the cases at hand.

Demco, Inc. (Demco), is a Wisconsin corporation that has elected to be an S corporation for Federal income tax purposes.

Mr. Wall was Demco's sole stockholder immediately before the gifts in issue. He owned all 1,200 issued and outstanding shares of Demco's voting common stock and all 12,000 issued and outstanding shares of Demco's nonvoting common stock.

On January 1, 1992, Mr. Wall (as grantor) and Michael O. Hartz (as trustee) created two irrevocable trusts for the benefit of each of Mr. Wall's 10 children. Of these 20 trusts, 10 were known as "annual exclusion" trusts, and 10 were known as "nonvoting stock" trusts.

Also on January 1, 1992, Mr. Wall gave 443 shares of his Demco nonvoting common stock to each of the annual exclusion trusts and 495 shares of his Demco nonvoting common stock to each of the nonvoting stock trusts. As a result of these transactions, Mr. Wall gave 938 shares of the Demco nonvoting common stock to trusts for the benefit of each of his 10 children, for total gifts of 9,380 shares (collectively, the gifts).

After the gifts, Mr. Wall continued to own all 1,200 shares of Demco's voting common stock and the remaining 2,620 shares of Demco's nonvoting common stock.

Demco's stock was not listed on an exchange on or around the date of the gifts, and there was no other public market for Demco stock.

Demco's History and Business

Demco is a direct mail distributor and manufacturer of office supplies, furniture, and accessories. Demco's principal customers are libraries, schools, and professional and business offices. Demco distributes its products nationwide and has over 100,000 customers.

Demco started doing business in 1906 as part of the Democrat Printing Company of Madison, Wisconsin. In 1931, Demco was chartered as Demco Library Supplies, Inc., a company owned and operated by Norman Bassett. In January 1972, Demco became a wholly owned subsidiary of George Banta Co. of Menasha, Wisconsin, a publicly owned educational printer. In 1978, following a failed takeover attempt by another corporation, Demco's management (including Mr. Wall, who was then Demco's president and chief executive officer) acquired Demco's stock in a leveraged buyout.

Demco's headquarters are in Madison, Wisconsin. At the time of the gifts, Demco also operated a 15,700 square foot

distribution facility in Fresno, California, and a 131,000 square foot distribution, manufacturing, and converting facility in DeForest, Wisconsin.

Demco had built a strong reputation for quality, service, and moderate pricing by the time of the gifts, all of which gave Demco good name recognition and a strong market position. Demco also had a strong continuing customer base which generated repeat business.

Demco had an experienced management team at the time of the gifts that had worked together for many years. Demco's relationship with its workforce (which was nonunion) was good, turnover was low, and Demco had not experienced any difficulty recruiting qualified employees at all levels. During 1991, the year immediately prior to the gifts, Demco had approximately 235 employees.

Demco's net revenues and net income for 1987-91 (the 5 years prior to the gifts), and Demco's projected net revenues and net income for 1992 (the year of the gifts, as projected by management around the time of the gifts) were as shown in the following table:[2]

---

[2] The financial information in the table was compiled from Demco's audited and unaudited financial statements and management's projections for 1992, as adjusted by petitioners' expert Donna J. Walker (Ms. Walker) to eliminate the results of Demco's media division, which was sold in 1991. Respondent's

(continued...)

| Year | Net Revenues | Net Income |
|------|-------------|-----------|
| 1987 | $21,922,286 | $1,615,877 |
| 1988 | 25,060,137 | 1,314,997 |
| 1989 | 27,256,611 | 1,361,810 |
| 1990 | 29,770,281 | 1,002,367 |
| 1991 | 30,536,365 | 511,072 |
| 1992 (Projected) | 31,260,786 | 1,434,198 |

As the foregoing table shows, Demco's net revenues increased steadily from 1987 to 1991 and were projected to continue to increase in 1992. Demco's net income, however, decreased from 1987-90, then fell more sharply in 1991, but was projected to recover in 1992.

The decrease in Demco's net income was not caused by any increase in Demco's cost of goods sold; Demco's gross margin increased from 43.9 percent of net revenues in 1987 to 45.5 percent of net revenues in 1991. Rather, Demco's declining profitability was attributable to increases in its marketing and administrative expenses. From 1987 to 1991, Demco's marketing expenses increased from 16.5 percent of net revenues to 19.3 percent; administrative expenses increased even more sharply over the same period, from 9.7 percent of net revenues to 16.3 percent.

---

[2](...continued)
expert Gary L. Schroeder (Mr. Schroeder) considered this information to be reliable and used it to prepare his report.

Demco's management predicted that these trends would be reversed and that Demco's net income would return to historic levels in 1992.[3] Nevertheless, at the beginning of 1992 general economic conditions were unfavorable and Demco's principal customers (libraries and schools) were suffering from budget cuts. However, many economists predicted that a weak recovery would begin in mid to late 1992.

### Media Division Sale

From about 1970 or 1971 to June 1, 1991, Demco operated two other businesses, which the parties refer to as Demco's "media division". One of these businesses converted paperback books for use in school libraries, by rebinding the books in hard covers using Demco's "Turtle Back" process. The other business provided periodical subscriptions management services for libraries.

In June 1991, Demco discontinued the operations of the media division and sold the division's assets to a limited partnership. An S corporation owned entirely by Mr. Wall was the purchasing partnership's 1-percent general partner; an irrevocable trust for the benefit of Mr. Wall's family was the purchaser's 99-percent limited partner.

---

[3] In particular, Mr. Wall testified that the expenses of a poorly performing division had caused 1991 earnings to decline by approximately $535,000; that division was later terminated.

The sales price for the media division's assets was $1,200,000. Of this amount, Demco received $120,000 in cash; it also received the purchasing partnership's note (media note) for the remaining $1,080,000 due. The media note was collateralized by substantially all of the acquired assets and bore interest at 7.64 percent. Mr. Wall expected Demco to receive full payment of the media note, and the note's outstanding principal amount had been reduced to approximately $430,000 by the time of trial.

Prior Transactions in Demco Stock

The parties have identified six transactions in Demco stock that occurred between 1978 and the gifts in 1992. All six transactions involved the sale or repurchase of stock to or from Demco employees. Three of the transactions occurred more than 5 years before the gifts. The three others occurred approximately 2 years before the gifts, on February 9, 1990, when Demco redeemed a total of 600 shares of its voting common stock from three of its officers.

The redeemed shares were subject to a buy-sell agreement at the time of the redemptions. The redemptions were not made pursuant to that agreement, because neither of the events that would have triggered the agreement (the death or termination of employment of any of the officers/shareholders) had occurred. The redemption price paid to each officer was instead determined through individual negotiations. However, under the terms of the

buy-sell agreement, each officer ultimately would have been entitled to receive the book value of his stock upon his death or earlier termination of employment.[4]

The parties agree that the book value of the redeemed stock shortly before the redemptions was $4,391 per share.  The average redemption price of $4,750 per share therefore exceeded that book value by approximately 8 percent.

Demco's equity capital immediately before the redemptions consisted of 1,800 shares of voting common stock, 1,200 of which were owned by Mr. Wall.  The 600 shares redeemed therefore represented a one-third, voting but noncontrolling, interest in Demco.  If (1) the average redemption price was equal to the fair market value of the redeemed stock and (2) each share of Demco's stock had the same value, then after adjusting for the greater number of shares (13,200) outstanding at the time of the gifts, the $4,750 average redemption price would have been equivalent to approximately $432 per share.[5]

---

[4] As matters turned out, two of the officers did not retire until 6 years after the redemptions, in 1998; the third officer was still employed by Demco at the time of trial (March 1999).

[5] The calculation is ($4,750 average redemption price per share) times (1,200 shares outstanding after redemption) equals ($5,700,000 post-redemption value) divided by (13,200 shares outstanding at time of gifts) equals ($432 per share).

Demco's net income fell sharply during the 2 years between
the redemptions and the gifts.[6]

OPINION

Preliminary Observations

Before discussing our findings and analysis of value, we
make some observations about the cases at hand and about
valuation cases generally.

First, the parties' original positions, as set forth in the
gift tax returns and the statutory notices, were not very far

---

[6] Petitioners asserted before trial that the redemptions and
the sale of the media division had "never been properly raised as
issues by respondent". Petitioners objected on that ground to
our consideration of any facts or issues relating to those
transactions.

Notwithstanding their objections, petitioners introduced
evidence at trial concerning the redemptions and the media
division sale. Petitioners' briefs do not mention any objection
to our consideration of this evidence. Moreover, petitioners'
briefs contain extensive proposed findings of fact concerning
both the redemptions and the media division sale; they also set
forth petitioners' arguments on the effect those transactions
should have on our determination of the fair market value of
Demco stock. As a result, petitioners have waived their
objections. See Stringer v. Commissioner, 84 T.C. 693, 706
(1985), affd. without published opinion 789 F.2d 917 (4th Cir.
1986); Estate of Miller v. Commissioner, T.C. Memo. 1998-416
(objection to admission of testimony held waived because
objecting party's brief proposed finding of fact and set forth
argument based on that testimony). We also note that the
original report of petitioners' expert Ms. Walker discussed both
the redemptions and the media division sale. Petitioners
submitted a copy of that report with their gift tax returns and
rely on it in the cases at hand.

apart. The $260.13 value determined in the notices was only 17 percent greater than the $221.75 value claimed in the returns.

Second, this litigation has not helped the parties settle and compromise their differences; to the contrary, it has driven the parties further apart. The overall value of $192.20 per share set forth in the revised report of petitioners' expert Donna J. Walker (Ms. Walker) is lower than the value claimed in the gift tax returns; the overall value of $273.99 per share set forth in the report of respondent's expert Gary L. Schroeder (Mr. Schroeder) is higher than the value determined in the statutory notices, although respondent has not asserted an increased deficiency.[7]

In light of these observations, what the Court had to say in Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441 (1980), concerning the "pure factual issue" of valuation, is particularly germane to the cases at hand:

> As the Court repeatedly admonished counsel at trial, the issue is more properly suited for the give and take of the settlement process than adjudication. The existing record reeks of stubbornness rather than flexibility on the part of both parties, based upon "an overzealous effort * * * to infuse a talismanic precision" into their respective views as to valuation.

---

[7] Notwithstanding their differing conclusions about value, the parties' experts agree on many important matters concerning the proper measure of Demco's historical financial performance, the methods to be used to appraise value based on that performance, and the availability and magnitude of lack of marketability and nonvoting stock discounts. See infra p. 38.

> We are convinced that the valuation issue is capable of resolution by the parties themselves through an agreement which will reflect a compromise Solomon-like adjustment, thereby saving the expenditure of time, effort, and money by the parties and the Court--a process not likely to produce a better result. Indeed, each of the parties should keep in mind that, in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach. * * * [Id. at 451-452; citations omitted.]

Of course, because the parties have insisted that we value the Demco stock, we shall do our job.

For the reasons set forth below, we conclude petitioners have not shown that the value of the gifts was less than the $260.13 per share respondent determined in the statutory notices. To the contrary, the record persuades us that the value was at least equal to that amount.

In reaching this conclusion, we are not imposing a sanction on petitioners, cf. the taxpayer's argument in Estate of Kaplin v. Commissioner, 748 F.2d 1109, 1111-1112 (6th Cir. 1984), revg. on another ground T.C. Memo. 1982-440, nor should Buffalo Tool & Die be interpreted as expressing an intention to do so in any comparable circumstances. See Parker v. Commissioner, 86 T.C. 547, 562 (1986). We have merely found respondent's original determination in the statutory notices to be closer to the actual

value than either petitioners' return position or the position taken in petitioners' expert's revised report.

Relevant Law

Section 2512(a) provides that, if a gift is made in property, "the value thereof at the date of the gift shall be considered the amount of the gift." Value for this purpose is fair market value; i.e., the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts. See sec. 25.2512-1, Gift Tax Regs.; see also United States v. Cartwright, 411 U.S. 546, 551 (1973).

Mr. Wall gave 9,380 shares of Demco nonvoting common stock to 20 trusts for the benefit of his children on January 1, 1992. The cases at hand therefore require us to determine the fair market value of that Demco stock as of the date of the gifts, January 1, 1992.

If stock is listed on an exchange or there is otherwise a market for the stock, fair market value generally is determined by reference to the stock's quoted selling prices or bid and asked prices, at or around the time of the gift. See sec. 25.2512-2, Gift Tax Regs. If there is no market for the stock, arm's-length transactions made in the normal course of business, within a reasonable time before or after the date of the gift,

may be the best evidence of fair market value. See Ward v. Commissioner, 87 T.C. 78, 101 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979).

Demco stock was not listed on an exchange at the time of the gifts, and there was no other public market for Demco stock. The parties have identified six transactions in Demco stock occurring prior to the gifts. However, three of these transactions occurred more than 5 years before the gifts. The three others (the redemptions from Demco's officers) were consummated almost 2 years before the gifts; Demco's net income declined sharply during those years. Moreover, the officers whose stock was redeemed would have been entitled, under the terms of the buy-sell agreement, to receive the book value of the stock upon their deaths or earlier terminations of employment. The redemption price actually paid was only slightly higher than book value. For all these reasons, the redemptions and other prior transactions in Demco stock are not the best evidence of, and should not by themselves determine, the fair market value of Demco stock on the date of the gifts.

In cases such as those at hand, where there is no market for the stock to be valued and there are no dispositive arm's-length transactions, fair market value is to be determined by taking all

"relevant factors" into account.[8]  See sec. 25.2512-2(f), Gift

Tax Regs.  The factors we must consider are those that an

informed buyer and an informed seller would take into account.

See <u>Hamm v. Commissioner</u>, 325 F.2d 934, 938 (8th Cir. 1963),

affg. T.C. Memo. 1961-347.  Rev. Rul. 59-60, 1959-1 C.B. 237,

"has been widely accepted as setting forth the appropriate

criteria to consider in determining fair market value", <u>Estate of

Newhouse v. Commissioner</u>, 94 T.C. 193, 217 (1990); it lists the

following factors to be considered, which are quite similar to

the "relevant factors" listed in section 25.2512-2(f), Gift Tax

Regs.:

> (a) The nature of the business and the history of the
> enterprise from its inception.

> (b) The economic outlook in general and the condition
> and outlook of the specific industry in particular.

---

[8] Petitioners' expert Ms. Walker stated that the three
transactions in Demco stock that occurred more than 5 years
before the gifts were "not deemed relevant to the valuation" due
to the passage of time.  By contrast, Ms. Walker asserted that
the redemptions were "not conclusively indicative of fair market
value" due to the buy-sell agreement.  However, she never stated
that they were irrelevant.

We agree with Ms. Walker's conclusion that none of the prior
transactions is determinative.  However, we believe that the
redemptions, which took place at a price equivalent to
approximately $432 per share, are nevertheless relevant evidence
of the value of the gifts, to be taken into account with all
other relevant factors.  Although the three officers/shareholders
could have received book value for their stock upon their deaths
or terminations of employment, two of the officers did not choose
to retire until 6 years after the redemptions; the third was
still in Demco's employ at the time of trial.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend-paying capacity.

(f) Whether or not the enterprise has goodwill or other intangible value.

(g) Sales of the stock and the size of the block of stock to be valued.

(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

In short, the fair market value of the Demco stock is a question of fact that depends on all the circumstances. See Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part on another ground T.C. Memo. 1956-178; Estate of Newhouse v. Commissioner, supra at 217; Skripak v. Commissioner, 84 T.C. 285, 320 (1985). The weight to be accorded any particular evidentiary factor is also to be determined by the circumstances. See sec. 25.2512-2(f), Gift Tax Regs.

As is customary in valuation cases, the parties primarily rely on expert opinion evidence to support their positions. We evaluate expert opinions in light of the demonstrated qualifications of each expert and all other evidence in the record. See Anderson v. Commissioner, supra at 249; Parker v. Commissioner, supra at 561. We have broad discretion to evaluate

"'the overall cogency of each expert's analysis.'" Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1983-200), affg. in part and revg. in part on another ground T.C. Memo. 1986-318. Expert testimony sometimes aids the Court in determining value; sometimes it does not, particularly when the expert is merely an advocate for the position argued by one of the parties. See, e.g., Estate of Halas v. Commissioner, 94 T.C. 570, 577 (1990); Laureys v. Commissioner, 92 T.C. 101, 129 (1989).

We are not bound by the formulas and opinions proffered by an expert witness and will accept or reject expert testimony in the exercise of sound judgment. See Anderson v. Commissioner, supra at 249; Estate of Newhouse v. Commissioner, supra at 217; Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). Where necessary, we may reach a determination of value based on our own examination of the evidence in the record. See Lukens v. Commissioner, 945 F.2d 92, 96 (5th Cir. 1991) (citing Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285)). Moreover, while we may accept the opinion of an expert in its entirety, see Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. at 452, we may be selective in the use of any part of such opinion or reject the opinion in its entirety, see Seagate Tech., Inc. v. Commissioner, 102 T.C. 149,

186 (1994), and authorities cited therein.  Finally, because valuation necessarily results in an approximation, the figure at which we arrive need not be directly attributable to specific testimony if it is within the range of values that may properly be arrived at from consideration of all the evidence.  See Silverman v. Commissioner, supra at 933; Alvary v. United States, 302 F.2d 790, 795 (2d Cir. 1962).

Petitioners' Expert's Reports

Petitioners rely on two reports prepared by Ms. Walker as the primary evidence in support of their position.  Ms. Walker received a bachelor of arts degree from the University of Wisconsin at Madison.  She is a Chartered Financial Analyst and a member of the American Society of Appraisers, holding the Accredited Senior Appraiser (business valuation) designation.

Ms. Walker prepared her first report several years before trial; a copy of that report was submitted with petitioners' gift tax returns for the year in issue.[9]  Ms. Walker prepared a revised report shortly before trial, to respond to respondent's criticism of Ms. Walker's failure to include an "income-based"

---

[9] Although Ms. Walker's original report concluded that the overall value of the gifts was $211.20 per share, petitioners reported a 5 percent higher value, $221.75 per share, on their gift tax returns.  Mr. Wall testified that the reason for this was his accountants' advice, based on their experience with respondent's local personnel, that the lack of marketability and nonvoting stock discounts determined by Ms. Walker "might better be a little more conservative".

determination of value in her original report.

Ms. Walker was a principal of Willamette Management Associates, Inc., when she prepared her original report. She was a principal of Columbia Financial Advisors, Inc., when she prepared her revised report; she was still a principal of Columbia at the time of trial. Respondent stipulated Ms. Walker's qualifications and expert status.

### Ms. Walker's Original Report

In her original report, Ms. Walker relied almost entirely on the "guideline public company", or "market-based", approach to appraise the fair market value of the Demco stock.[10] In one variation of this approach, Ms. Walker calculated several measures of Demco's historical financial performance; she then used her guideline company data to determine how the public stock markets would have valued a company with those performance measures. In the other variation, Ms. Walker applied the guideline public company data to three measures of Demco's projected financial performance for 1992, the year of the gifts.

---

[10] Ms. Walker's original report did include one "income-based" approach, in which Ms. Walker appraised Demco's value by capitalizing Demco's distributions to stockholders for 1991 (as adjusted by Ms. Walker). However, Ms. Walker concluded that this approach deserved very little weight.

Historical Performance Measures Approach

To avoid having to take into account differing amounts of leverage, Ms. Walker decided to perform her analysis on a "debt free" basis. She examined Demco's audited and unaudited financial statements for the 5 years prior to the year of the gifts, i.e., for 1987-91; she then used those statements to develop measures of what Demco's financial performance would have been, if it had had no debt.[11]

The debt-free performance measures Ms. Walker developed were the following:

1.  Earnings before interest and taxes (EBIT) for 1991 and for 1987-91.

2.  Earnings before depreciation (including amortization), interest, and taxes (EBDIT) for 1991 and 1987-91.

3.  Debt free net income (DFNI) for 1991 and 1987-91.

4.  Debt free cash-flow (DFCF) for 1991 and 1987-91.

5.  Debt free book value of total invested capital (BVIC) for 1991.

Ms. Walker determined that seven publicly traded companies were sufficiently similar to Demco to serve as guideline companies.[12] She examined the performance measures and trading

---

[11] Because she wanted to perform her analysis on a continuing operations basis, Ms. Walker further adjusted her performance measures to eliminate financial results attributable to Demco's media division, which was sold in June 1991.

[12] The companies were Action Products International, Inc.;
(continued...)

prices of the guideline companies, in order to determine the multiples of the performance measures at which the public stock markets valued the total invested capital of the guideline companies. Applying these multiples to Demco's performance measures, and giving greater weight to the indicated values developed from the earnings based measures, Ms. Walker determined that the publicly traded equivalent value of Demco's total invested capital, as of December 31, 1991, was $10,550,000.[13] Ms. Walker then subtracted the book value of Demco's debt ($5,636,000) from this amount, to conclude that the indicated fair market value of Demco's equity (before applying any discounts) was $4,914,000.

Because the guideline public company method determines value by reference to the trading prices of minority interests, Ms. Walker did not apply a minority discount to her indicated value of Demco's equity. However, on the basis of several studies

---

[12](...continued)
Banta Corp.; Educational Development Corp.; Kleer-Vu Industries, Inc.; Library Bureau, Inc.; Stuart Hall Co., Inc.; and United Stationers, Inc.

[13] Although Ms. Walker's reports appraised the value of Demco stock as of Dec. 31, 1991, the day before the date of the gifts, the parties have not suggested and nothing in the record suggests that Ms. Walker's opinion would be any different with respect to the stock's value as of the date of the gifts. For convenience, we hereinafter discuss Ms. Walker's reports and opinions as though they referred to fair market value as of the date of the gifts rather than the day before.

comparing the trading prices of restricted stock with freely traded stock, and other studies comparing the trading prices of stock before and after initial public offerings, Ms. Walker concluded that a 40-percent lack of marketability discount should be applied to her guideline public company value. In addition, on the basis of other studies comparing prices of voting and nonvoting stock, Ms. Walker concluded that a further 5-percent discount should be applied to reflect the nonvoting status of the stock given by Mr. Wall.

After having applied these discounts, under Ms. Walker's historical performance measures/guideline public company approach the fair market value of the Demco nonvoting common stock as of the date of the gifts was $212.20 per share.[14]

### Forecasted-Earnings Approach

Ms. Walker also applied the guideline public company approach to Demco's projected earnings for 1992, the year of the gifts. Using projections made by Demco's management, Ms. Walker calculated three forecasted earnings measures for Demco: 1992 EBIT, EBDIT, and after tax earnings. Applying multiples derived from two of her guideline companies to these forecasted earnings

---

[14] The calculation is (total equity value) times (1 minus lack of marketability discount) times (1 minus nonvoting discount) divided by (number of shares outstanding), or ($4,914,000) times (.6) times (.95) divided by (13,200) equals ($212.20 per share).

measures, Ms. Walker concluded that the publicly traded
equivalent value of Demco's equity was $4,900,000.  This is not
materially different from the $4,914,000 value Ms. Walker
determined using historical performance measures.

Conclusion of Ms. Walker's Original Report

Giving great weight to the two guideline company approaches
(historical performance and 1992 forecasted earnings), and giving
very little weight to a capitalized distributions approach,[15] Ms.
Walker concluded that the publicly traded equivalent value of
Demco's equity was $4,890,000.  After applying the 40-percent
lack of marketability and 5-percent nonvoting discounts, Ms.
Walker concluded that the fair market value of the Demco
nonvoting common stock on the date of the gifts was $211.20 per
share.[16]

Ms. Walker's Revised Report

In February 1999, Ms. Walker prepared a revised report
appraising the value of the Demco stock.  This report was
prepared in response to respondent's criticism that Ms. Walker's
original report had failed to include an income-based
determination of Demco's value.  In response to respondent's

---

[15] See supra note 10.

[16] The calculation is ($4,890,000) times (.6) times (.95)
divided by (13,200) equals ($211.16) per share, which Ms. Walker
rounded to $211.20.

criticism, Ms. Walker's revised report combined an income-based approach with the market-based approach of her original report.

Ms. Walker's Income-Based Approach

In general, a market-based appraisal concentrates on a company's historical performance measures and, by reference to guideline public company multiples, attempts to determine the price at which the stock of a company with those performance measures would trade. An income-based appraisal, by contrast, is more forward looking; it attempts to predict, and then determine the present value of, all future returns an investor could expect to receive from an investment in the subject company. See Pratt et al., Valuing Small Businesses and Professional Practices 236-240 (3d ed. 1998).[17]

Because an income-based approach attempts to value directly the future cash-flows that will be generated by an investment in the subject company, it will produce accurate results only if an accurate forecast of the company's future earnings is available. See id. at 257. It appears from the record that at the time of

---

[17] As Ms. Walker's reports and testimony made clear, no bright line separates market-based appraisal methods from income-based methods. For example, Ms. Walker's market-based appraisal used some performance measures derived from Demco's forecasted income for 1992. Also, both Ms. Walker and respondent's expert Mr. Schroeder determined the discount (or capitalization) rates used in their income-based appraisals by reference to the actual rates of return available on publicly traded investments. See infra pp. 28-29 and pp. 35-36.

the gifts, Demco's management had only predicted 1 year (1992) of future results.  Ms. Walker stated in her revised report that she normally would have a 3- to 5-year forecast available when performing an income-based appraisal.

It is important to note that because Ms. Walker did not have a long-term forecast, she did not attempt to predict Demco's future cash-flows for use in her income-based analysis. Moreover, because Demco's historical cash-flow varied greatly from year to year, Ms. Walker did not use Demco's historical cash-flows in her analysis either.  Instead, Ms. Walker used Demco's historical results to develop what she called Demco's "normalized" free cash-flow; she then simply assumed that this cash-flow would grow 5 percent per year indefinitely after 1992.

More particularly, in her income-based appraisal Ms. Walker: (1) Examined Demco's operating results for 1987-91 and its forecasted results for 1992; (2) used those results to derive what she called Demco's "normalized free cash-flow", or "dividend paying capacity"; (3) assumed this normalized cash-flow would continue indefinitely after 1992 and grow 5 percent per year; and (4) determined the present value of that indefinite cash-flow using a 22.75-percent capitalization rate.[18]  As the preceding

---

[18] Ms. Walker described this method as a form of the "constant growth dividend discount model".  Ms. Walker stated that she typically used this method when she did not have a long-
(continued...)

sentence makes clear, the two key variables in this approach are Demco's normalized free cash-flow and the appropriate discount or capitalization rate to be used to determine the present value of that cash-flow.

In order to determine Demco's normalized free cash-flow, Ms. Walker began by adding Demco's 1987 to 1991 pretax income to its forecasted 1992 pretax income; she then divided that sum by the number of years in the period (6) to arrive at an average annual pretax income of $1,097,381. Ms. Walker then made the following adjustments to this average to arrive at normalized free cash-flow:

     1. She subtracted hypothetical income taxes at a 34-percent rate.[19]

---

[18](...continued)
term forecast for the subject company.

[19] Because Demco is an S corporation, it is not subject to Federal income tax and pays only a small amount of State income tax. Nevertheless, Ms. Walker computed Demco's normalized free cash-flow by subtracting a hypothetical income tax, at a 34-percent rate, from Demco's average income for 1987-92. This is referred to as "tax-effecting" Demco's income.

As Ms. Walker acknowledged in her testimony, appraisers disagree on whether it is appropriate to tax-effect the income of an S corporation. The argument in favor of tax-effecting stresses that many potential buyers of S corporations are C corporations. Because a C corporation would be unable to maintain a target company's S corporation status following an acquisition, the C corporation would tax-effect the S corporation's income (at C corporation rates) in deciding how much it would pay for the S corporation. See Trugman, Understanding Business Valuation: A Practical Guide to Valuing
(continued...)

2.   She subtracted an amount equal to 5 percent of Demco's working capital in 1991, because she assumed working capital would grow from that level at a 5-percent rate.

3.   She added an amount equal to 5 percent of Demco's indebtedness in 1991, because she assumed debt would increase from that amount at a 5-percent rate.

4.   She subtracted an amount equal to the excess of Demco's average capital expenditures for 1987-91 over its average depreciation and amortization for that period.

5.   She increased the overall result by 5 percent, because she assumed Demco would grow 5 percent from 1991 to 1992.

On the basis of all these calculations and assumptions, Ms. Walker determined that Demco's normalized free cash-flow for 1992 would be $720,317.

---

[19](...continued)
Small to Medium-Sized Businesses, at 198-199 (1998).  By contrast, the argument against tax-effecting stresses that although an S corporation's stockholders are subject to tax on the corporation's income, they are generally not subject to a second level of tax when that income is distributed to them. This could make an S corporation at least somewhat more valuable than an equivalent C corporation.  However, tax-effecting an S corporation's income, and then determining the value of that income by reference to the rates of return on taxable investments, means that an appraisal will give no value to S corporation status.

In her revised report, Ms. Walker computed the present value of Demco's tax-effected cash-flow using a capitalization rate determined by reference to the market rates of return on Treasury securities and common stocks.  See infra pp. 28-29.  The interest and dividends on such investments are fully taxable to their holders.  Because this methodology attributes no value to Demco's S corporation status, we believe it is likely to result in an undervaluation of Demco's stock.  See Gross v. Commissioner, T.C. Memo. 1999-254.

Ms. Walker developed her capitalization rate in part by reference to two sources:  (1) The 1991 yield on long-term Treasury securities, as set forth in the report of respondent's expert; and (2) the rates of return on publicly traded stocks (the Ibbotson data) as set forth in Ibbotson Associates, Stocks, Bonds, Bills, & Inflation, 1992 Yearbook.

As Ms. Walker correctly noted, respondent's expert stated in his report that in December 1991, the rate of return on a risk-free investment (long-term Treasury securities) was 7.7 percent.[20]  According to Ms. Walker, the Ibbotson data revealed that historically, the annual return on the Standard & Poors 500 Composite Common Stock Index (S & P 500) was 7.4 percentage points higher than a risk-free return; it also revealed that the annual return on stocks of smaller companies was 5.1 percentage points higher than the overall S & P 500 return.

Ms. Walker was of the opinion that because Demco was significantly smaller than the average small public company, investors would demand an additional risk premium of 2.55 percentage points (one-half the 5.1 percentage point additional return on small company stocks) on any investment in Demco stock.

_____

[20] We note that in her original report Ms. Walker stated that at the end of 1991, the yield on 30-year Treasury bonds was only 7.39 percent; she also stated that this yield was expected to be 7.30 percent in June 1992 and 7.49 percent at the end of 1992.

Therefore, on the basis of the Ibbotson data and her opinion, Ms. Walker concluded that an appropriate capitalization rate for Demco was 22.75 percent, calculated as follows: (1) A 7.7-percent risk-free rate; plus (2) a 7.4-percent equity-risk premium; plus (3) a 5.1-percent small company risk premium; and plus (4) an additional 2.55-percent premium to reflect Demco's exceptionally small size.

Taking her normalized free cash-flow of $720,317, and capitalizing this at a net rate of 17.75 percent (i.e., 22.75 percent capitalization rate, less 5-percent assumed growth rate), Ms. Walker concluded that under her income-based method the value of Demco's equity would be $4,058,124.

Ms. Walker also concluded in her revised report, as she had in her original report, that a 40-percent lack-of-marketability discount and a 5-percent nonvoting discount should be applied. After applying these discounts, the value of the nonvoting Demco common stock on the date of the gifts, under Ms. Walker's income-based analysis, was $175.24 per share.

<u>Conclusion of Ms. Walker's Revised Report</u>

Ms. Walker's original report concluded that the fair market value of the Demco nonvoting common stock, as of the date of the gifts, was $211.20 per share. As noted, under Ms. Walker's income-based analysis the stock's value was $175.24 per share.

In her revised report, Ms. Walker relied on both her market-based and her income-based results to arrive at her final opinion on the value of the Demco stock. Giving these methods equal weight (and after rounding), Ms. Walker stated in her revised report that in her opinion, the value of the Demco nonvoting common stock was $192.20 per share on the date of the gifts.

Ms. Walker's Testimony

Although Ms. Walker's revised report was more recent than, and incorporated the conclusions of, her original report, Ms. Walker did not disavow her original report at trial. To the contrary, Ms. Walker testified that it remained her opinion that her original report's $211.20 conclusion was a reasonable indication of fair market value. She further observed that valuation is not an exact science; as she saw it, her revised report simply indicated that one could justify a lower value than her original report's $211.20 value, if one chose to do so.

Respondent's Expert's Report

Respondent primarily relies on the February 1999 report of Gary L. Schroeder to support respondent's position.[21] Mr.

---

[21] Mr. Schroeder had prepared an earlier version of his report in January 1996; respondent relied on that report to prepare the statutory notices. Mr. Schroeder's 1996 report had concluded that the overall value of the gifts was $260.13 per share, the same amount asserted in the statutory notices. Mr. Schroeder's February 1999 report concluded that the overall value was $273.99 per share.

(continued...)

Schroeder is associated with the St. Louis area office of Mentor Valuations, Inc.  Like Ms. Walker, Mr. Schroeder is a member of the American Society of Appraisers and holds the Accredited Senior Appraiser (business valuation) designation.  Mr. Schroeder's report employed both a guideline public company approach and an income-based approach to appraise the value of the Demco stock.

### Mr. Schroeder's Guideline Company Approach

Except for its treatment of the media note (discussed immediately below) and its conclusion as to value, Mr. Schroeder's guideline company approach was quite similar to Ms. Walker's.  In fact, Mr. Schroeder used Ms. Walker's calculations of Demco's net revenues and net income as the starting point for the derivation of his performance measures.  He also used two of the guideline companies chosen by Ms. Walker, Educational Development Corporation and Library Bureau, Inc.  However, Mr. Schroeder used only four performance measures and three guideline companies to derive Demco's value; this is far fewer than the 12

---

[21](...continued)
There are only two material differences in methodology between the two versions of Mr. Schroeder's report.  First, in his 1999 report, Mr. Schroeder treated the media note as a nonoperating asset (see infra p. 32); he had not been able to do this in his 1996 report due to a lack of financial data. Second, in his 1999 report Mr. Schroeder gave his income-based value for Demco's stock approximately twice the weight of his market-based value; he had given his income and market-based values approximately equal weight in his 1996 report.

measures and seven companies used by Ms. Walker.[22]  In addition,
the multiples chosen by Mr. Schroeder appeared to vary more from
one guideline company to another than the multiples chosen by Ms.
Walker.

Notwithstanding these distinctions, the major methodological
difference between the guideline company approaches of Mr.
Schroeder and Ms. Walker is that Mr. Schroeder treated the media
note as a separate, "nonoperating" asset.  As a result, Mr.
Schroeder used a three-step procedure to derive his market-based
value for Demco.  First, he developed four historical performance
measures for Demco that completely excluded the media division's
operating results and the interest payable on the media note.
Second, he applied the guideline company multiples he developed
to those measures.  Third, he added the media note's $1,080,000
face amount to his guideline company value.

Having performed these steps, Mr. Schroeder concluded that
the value of Demco's equity, before any discounts, was

---

[22] The four measures used by Mr. Schroeder were:  "adjusted
net income" for 1991 and for 1987 to 1991, and "revenues" for
1991 and for 1987 to 1991.  Mr. Schroeder's revenues were equal
to Demco's net revenues as calculated by Ms. Walker.  Mr.
Schroeder's "adjusted net income" was equal to Demco's net income
as calculated by Ms. Walker, less:  (1) The 6 months of interest
on the media note included in Ms. Walker's net income for 1991;
(2) a few nonrecurring items; and (3) a provision for income tax
at 34 percent.

The third guideline company used by Mr. Schroeder was Viking
Office Products, Inc.

$6,800,000. On the basis of his review of studies similar to those cited by Ms. Walker, Mr. Schroeder concluded that both lack of marketability and nonvoting stock discounts should be applied. Like Ms. Walker, Mr. Schroeder concluded that the lack of marketability discount should be 40 percent. However, he concluded that the nonvoting stock discount should be only 2 percent as opposed to the 5-percent discount proposed by Ms. Walker.

Applying these discounts to his total equity value, Mr. Schroeder concluded that under his market-based method the value of the Demco nonvoting common stock on the date of the gifts was approximately $2,840,000, or $303.03 per share. This is approximately $92 per share more than Ms. Walker's $211.20 market-based value. It is also approximately $33 per share more than the $269.70 market-based value (and approximately $43 more than the $260.13 overall value) determined in the earlier version of Mr. Schroeder's report, on which respondent relied in preparing the statutory notices. See supra note 21.

### Mr. Schroeder's Income-Based Approach

Mr. Schroeder's income-based approach differs from Ms. Walker's income-based approach in several important respects. First, in his income-based approach Mr. Schroeder again treated the media note as a nonoperating asset whose value should be added to the present value of Demco's predicted future income

from sources other than the note.  Second, Mr. Schroeder expressly stated that his approach was designed to produce a "control" value for Demco, rather than a minority value; he therefore applied a 17-percent minority discount to the present value of Demco's future income.  Third, Mr. Schroeder's determinations of both Demco's future income and the appropriate discount rate to apply to that income were quite different from Ms. Walker's.

With respect to his estimation of Demco's future income, Mr. Schroeder, unlike Ms. Walker, did attempt to predict Demco's operating results for 1992-96.  Of course, because Demco's management had not made any long-term forecasts, Mr. Schroeder's predictions, like Ms. Walker's extrapolations, necessarily were based to a considerable extent on Demco's historical operating results.  Nevertheless, Mr. Schroeder did specifically predict that Demco's distribution, marketing, and administrative expenses would decline from their 1991 levels.  He also predicted that management's forecasted 1992 net income was too high.[23]

With respect to the appropriate discount rate, Mr. Schroeder chose a rate of 15 percent for 1992, the first year of his

---

[23] We note that Mr. Schroeder, like Ms. Walker, tax effected Demco's future cash-flows by subtracting hypothetical income tax from Demco's projected net income (Mr. Schroeder used a 40-percent rate, while Ms. Walker used a 34-percent rate).  We believe this is likely to result in an undervaluation of Demco because Demco is an S corporation.  See supra note 19.

forecast; he then increased that rate by 0.5 percentage points for each of the next 4 years, to arrive at a terminal rate of 17 percent.  By contrast, Ms. Walker chose a 22.75-percent rate, as discussed above.

Mr. Schroeder's explanation for his choice of rates was not very clear.  Mr. Schroeder claimed that at the time of the gifts long-term BAA rated corporate bonds were yielding approximately 9 percent.  Mr. Schroeder then asserted that because an investment in Demco was riskier than an investment in BAA bonds, a 6-percentage point risk premium would be appropriate.  However, he did not explain why this was an appropriate premium.

Mr. Schroeder also attempted to justify his rates by reference to the Ibbotson data.  According to Mr. Schroeder, the Ibbotson data showed that the average historical return on small company stocks was 17.5 percent.  Mr. Schroeder then asserted that a lower rate than this would be appropriate for his analysis, because controlling investors would accept a lower rate of return than minority investors would; once again, Mr. Schroeder did not offer any support for this assertion. Moreover, Mr. Schroeder did not contest Ms. Walker's observations that 7.7 percent was an applicable risk-free rate at the time of the gifts and that small company stocks have historically yielded 12.5 percentage points more than risk-free investments.

Setting these objections aside for the moment, Mr. Schroeder calculated his income-based value of Demco as follows.  First, he calculated the present value of Demco's 1992-96 projected net income, by discounting it at his 15- to 17-percent rates.  Second, he computed a 1997 residual value for Demco, by assuming that Demco's 1996 projected net income would grow at 3 percent per year in perpetuity and capitalizing that income at his 17-percent rate; he then discounted that terminal value back to a present value as of the date of the gifts.  Third, he added the foregoing values together and applied his 17-percent minority discount, to arrive at an income-based minority equity value of $4,770,010.  Fourth, he added the face amount of the media note to arrive at a total equity value of $5,850,010.  Fifth and finally, he applied his 40-percent lack-of-marketability and 2-percent nonvoting discounts, to arrive at rounded values of $2,440,000 or $260.61 per share.  This is approximately $85 per share higher than Ms. Walker's $175.24 per share income-based value.

### Mr. Schroeder's Conclusion

Mr. Schroeder made his overall appraisal of Demco's value by combining his income-based and market-based values and giving the income-based value approximately twice as much weight.  In Mr. Schroeder's overall opinion, the fair market value of the Demco

nonvoting common stock Mr. Wall gave to his children, as of the
date of the gifts, was $2,570,000 or $273.99 per share.

Various Positions as to Value

The following table sets forth the various positions as to
value taken by the parties or their experts:

| Event or Report | Value per Share |
|---|---|
| Gift Tax Returns | $221.75 |
| Statutory Notices | $260.13 |
| Ms. Walker's Original Report | $211.20 |
| Ms. Walker's Revised Report | $211.20 (original report's market-based value)<br><br>$175.24 (new income-based value)<br><br>$192.20 (overall value conclusion) |
| Mr. Schroeder's Report | $303.03 (market-based value)<br><br>$260.61 (income-based value)<br><br>$273.99 (overall value conclusion) |

Discussion

As we observed at the outset, the parties' original
positions on the value of the gifts were quite close; this
litigation has driven the parties further apart. The overall
value asserted in Ms. Walker's revised report is less than the
value asserted in her original report and the value claimed by
petitioners on their gift tax returns. Similarly, the value
asserted in Mr. Schroeder's report is greater than the value

determined in his prior report that was used to prepare the statutory notices.

Notwithstanding their differing conclusions as to value, Ms. Walker and Mr. Schroeder agree on the following important points.

    1.  Both accept the same data as an accurate representation of Demco's financial performance.

    2.  Both agree that the guideline companies used in the market-based approaches are in fact comparable to Demco; two of the three companies used by Mr. Schroeder were included in the seven companies used by Ms. Walker.

    3.  Ms. Walker used a capitalization rate of 22.75 percent in her income-based analysis, while Mr. Schroeder used rates varying from 15 to 17 percent.  However, Ms. Walker assumed that Demco would grow 5 percent per year, while Mr. Schroeder assumed 3-percent growth.  The difference between the experts' positions (17.75-percent effective or net capitalization rate for Ms. Walker, 12-to-14-percent net rate for Mr. Schroeder) is therefore less than first appears.

    4.  Both Ms. Walker and Mr. Schroeder agreed that a 40-percent lack of marketability discount was appropriate.

    5.  Both Ms. Walker and Mr. Schroeder agreed that a nonvoting stock discount should also be applied; Ms. Walker asserted that the discount should be 5 percent while Mr. Schroeder contended that a 2-percent discount was more appropriate.

Despite the closeness of the parties' original positions and the large areas of agreement between the experts that existed even at time of trial, the parties have been unable to settle their differences, and we are now required to value the Demco stock.

Respondent determined in the statutory notices that the value of the gifts was $260.13 per share.  This determination is presumed to be correct; petitioners have the burden of proving it to be incorrect.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Estate of Jung v. Commissioner, 101 T.C. 412, 423 (1993).

Ms. Walker's and Mr. Schroeder's reports were generally thoughtful and professional, and their testimony was responsive and helpful.  Nevertheless, for the reasons set forth below, we conclude that Ms. Walker's guideline company approach significantly understated Demco's value, while Mr. Schroeder's guideline approach somewhat overstated value and has other flaws that limit its reliability.  We also conclude that the experts' income-based approaches are entitled to little weight, in part because it was very difficult to predict Demco's future income as of the time of the gifts.

As a result, we conclude petitioners have not shown that the value of the gifts was less than the $260.13 per share determined in the statutory notices.  To the contrary, the record establishes to our satisfaction that the value lay between the experts' guideline company values and was at least $260.13 per share.

Problems With the Guideline Company Approaches

Although Ms. Walker's guideline company approach was thorough and clear, deserves careful consideration, and is entitled to some weight, we believe it systematically understated Demco's value. First, it did not adequately take account of the value of the $1,080,000 media note. Second, it used erroneous measures of Demco's projected income for 1992. Third, it did not use all the guideline company multiples but instead picked and chose among the lowest.

Treatment of Media Note

As noted above, Ms. Walker adjusted Demco's historical performance and forecasted earnings measures to eliminate income attributable to the media division; that division was sold on June 1, 1991, in exchange for cash and the media note. However, Ms. Walker did not then readjust Demco's measures to include pro forma interest amounts on the media note, or any other amounts reflecting the media division's income from 1987 until the date of sale. As a result, the only income attributable to the media note reflected in the measures calculated by Ms. Walker was the 6 months' worth of interest that accrued on the note from the sale date to the end of 1991 and the interest projected to be received in 1992.

Demco's performance measures, as calculated by Ms. Walker,

therefore understated Demco's earning power and value. In fact, Ms. Walker testified that under her analysis, Demco's ownership of the media note--a $1,080,000 face amount, fully collateralized, interest bearing asset--did not materially increase the value of the Demco stock. By contrast, the nonoperating asset method used by Mr. Schroeder took the value of the media note into account, by adding it to the guideline value based on his performance measures, and we believe it is preferable to Ms. Walker's approach in that respect.

In her testimony, Ms. Walker admitted that Mr. Schroeder's treatment of the media note was a reasonable approach. However, Ms. Walker also stated that in her opinion, a minority discount should be applied to the value of the media note under that approach, because a minority stockholder could not require liquidation of Demco and thus could not realize the note's full value.

We agree with Ms. Walker on this point. We conclude that although Mr. Schroeder's treatment of the media note is preferable because it recognizes the note's value, it somewhat overstates that value to a minority stockholder. However, even if the 25-percent minority discount Ms. Walker proposed at trial were applied to the value of the media note, in addition to her 40-percent lack of marketability and 5-percent nonvoting stock

discounts, then treating the media note as a nonoperating asset would add approximately $35 per share to Ms. Walker's values.

Erroneous Income Amount

The forecasted earnings measures Ms. Walker used in her guideline company approach were significantly less than the measures actually projected by Demco's management. For example, Ms. Walker's original report stated that Demco was projecting 1992 EBIT of $1,372,000 and 1992 earnings of $1,034,615. However, Demco was actually projecting that its earnings would be approximately $400,000 higher; i.e., 1992 EBIT of $1,774,306 and earnings of $1,434,198. We conclude that Ms. Walker simply made a few transcription errors; nevertheless, these errors mean that Ms. Walker's appraisals significantly understated Demco's value.

If the 1992 EBIT and earnings actually projected by Demco were substituted for the erroneous amounts used by Ms. Walker, then Ms. Walker's appraisal of the Demco stock under her forecasted earnings approach would have been approximately $289 per share, approximately $77 per share higher than the forecasted earnings value set forth in her original report. The record does not disclose Demco's projected EBDIT for 1992. However, based on Demco's historical depreciation, we conclude that the measure of 1992 EBDIT used by Ms. Walker was, like her 1992 EBIT and earnings measures, also approximately $400,000 too low. If Ms. Walker's measure of Demco's 1992 EBDIT were also increased by

$400,000, then Ms. Walker's forecasted earnings value would have been approximately $315 per share, approximately $103 per share higher than the value in her original report. We note that these values are quite close to the $303 guideline company value set forth in Mr. Schroeder's report.

### Choice of Multiples

When Ms. Walker applied the guideline public company method to Demco's historical performance measures, she did not use the multiples of all seven companies she had identified as comparable. Instead, she consistently chose a multiple determined by reference to the two or three companies with the lowest multiples, as shown in the following table.

| Measure | Mean Multiple of the Comparable Companies | Multiple Used by Ms. Walker |
|---|---|---|
| 1991 EBIT | 10.1 | 8.2 |
| 1987-91 EBIT | 7.3 | 6.5 |
| 1991 EBDIT | 7.7 | 5.0 |
| 1987-91 EBDIT | 7.5 | 4.7 |
| 1991 DFNI | 13.6 | 13.0 |
| 1987-91 DFNI | 11.7 | 9.5 |
| 1991 DFCF | 8.8 | 6.5 |
| 1987-91 DFCF | 7.0 | 6.4 |
| BVIC | 1.19 | 1.25 |

Ms. Walker justified her disregard of most of the comparable companies' multiples by referring to the decline in Demco's

earnings from 1990-92. According to Ms. Walker, three of the seven comparable companies had also suffered recent earnings declines; it therefore made more sense to determine the applicable multiples by reference to those companies, rather than by reference to the comparable companies as a whole.

Ms. Walker's use of the two or three lower multiple companies is inconsistent with the conclusion expressed elsewhere in her report that, even after the decline in Demco's earnings had been taken into account, Demco's profitability and risk levels were close to or at the industry norm. It also may be inconsistent with her conclusion that the seven companies she identified as comparable were in fact comparable to Demco. For these reasons we believe that the multiples used by Ms. Walker resulted in an understatement of the value of the Demco stock. See Pratt et al., Valuing Small Businesses and Professional Practices 276 (3d ed. 1998) (warning the analyst that she should be cautious and careful, when using the guideline public company method, to ensure that the use of certain companies for some measures but not for others does not introduce bias or distortion into the value indications).

If the mean multiples of the comparable companies had been applied to Demco's historical performance measures instead of the multiples used by Ms. Walker, then the value of the Demco stock under Ms. Walker's historical performance measures approach would

have been approximately $300 per share, approximately $88 per share higher than the historical performance measures value in Ms. Walker's original report.[24]

We have similar concerns with Ms. Walker's choice of multiples in her forecasted earnings approach. Ms. Walker's original report discussed the forecasted earnings multiples of only two of the seven comparable companies. Moreover, the multiples Ms. Walker used were lower than even those two companies' multiples; the stated reason for this was that Demco was predicting higher earnings growth.

### Mr. Schroeder's Guideline Company Approach

Notwithstanding the foregoing criticisms of Ms. Walker's guideline company approach, we do not believe Mr. Schroeder's guideline public company approach deserves controlling weight. As noted above, Ms. Walker's guideline analysis was thorough and well explained; it is still entitled to some weight. In addition, Mr. Schroeder's approach somewhat overstates the media note's effect on value, because it does not apply a minority discount. We also accept Ms. Walker's criticism that it would have been preferable if Mr. Schroeder had used more than three guideline companies. Moreover, we note that Mr. Schroeder used

---

[24] The statement in the text assumes that each performance measure is equally weighted. Ms. Walker stated that she gave the earnings-based measures greater weight, but we are unable to determine the weighting she used.

only four performance measures; the multiples he used seemed to vary greatly from company to company, and his choice of multiples was not very well explained.

Problems With the Income-Based Approaches

Ms. Walker testified that in theory, income-based approaches should produce more accurate determinations of value, because they attempt to value directly the future income streams flowing from an investment. She also testified, however, that many assumptions must be made to employ such approaches and the results are highly sensitive to the assumptions used. Most importantly, if the subject company's future income is unpredictable, then income-based methods will produce inaccurate appraisals of the company's value. See Pratt et al., supra at 257.

We conclude that as of the date of the gifts, it was very difficult to predict Demco's future income. It appears that as of that date Demco's management had predicted only 1 year of future results. Due to the lack of a long-range forecast, Ms. Walker did not even attempt to predict Demco's future revenues. Instead, she used an average of Demco's historical and forecasted results to create a measure she described as Demco's "normalized" free cash-flow, and assumed this would grow at a constant rate. In this connection, we note that one of the leading treatises on business valuations cautions that historical averages or pure

extrapolations from those averages are usually inadequate bases for an income-based analysis; an analyst should use such averages only if she can explain why they are a reasonable proxy for future expectations. See Pratt et al., supra at 240, 254. Given the fluctuations in Demco's net income, the difficulties being experienced by Demco's major customer groups, and the unsettled economic conditions around the time of the gifts, it appears less likely than usual that Demco's past results could have served to predict its future results. We also note that Ms. Walker's original report relied entirely on a market-based approach; her revised report added an income-based approach only in response to respondent's criticism of her original report. For all these reasons, we conclude that Ms. Walker's income-based approach is entitled to little weight.

Although Mr. Schroeder at least attempted to predict Demco's future income, his income-based analysis suffers from the same flaws as Ms. Walker's. Mr. Schroeder's predictions, like Ms. Walker's extrapolations, were based to a great extent on Demco's average past performance. In addition, Mr. Schroeder did not explain or justify very well either his assumptions about future changes in Demco's performance or his choice of discount rates. We also note that although Ms. Walker had little criticism of Mr. Schroeder's guideline company approach--or couched that criticism in terms of reasonable professional differences--she identified

several more serious problems with Mr. Schroeder's income-based approach. For all these reasons, we conclude that Mr. Schroeder's income-based analysis, like Ms. Walker's, is entitled to little weight.

Conclusion

Ms. Walker's market-based appraisal of the Demco nonvoting common stock was $211.20 per share; Mr. Schroeder's market-based appraisal was $303.03 per share. For the reasons set forth above, Ms. Walker's market-based appraisal significantly understated Demco's value. As we have explained, treating the media note as a nonoperating asset would have increased Ms. Walker's market-based values by approximately $35 per share, even after applying the 25-percent minority discount Ms. Walker suggested. Similarly, using the correct projections for Demco's 1992 earnings would have added approximately $103 per share to Ms. Walker's forecasted earnings based valuation, while using the mean multiples of the comparable companies, instead of the lower multiples chosen by Ms. Walker, would have added approximately $88 per share to Ms. Walker's historical performance measures based valuation. Nevertheless, we still conclude that Mr. Schroeder's market-based appraisal somewhat overstated Demco's value, in part because it did not apply a minority discount to the media note; we also conclude that it does not deserve controlling weight because it used very few performance measures and comparable companies.

Ms. Walker's and Mr. Schroeder's income-based appraisals were lower than their market-based appraisals, at $175.24 per share and $260.61 per share, respectively. However, we conclude that those income-based appraisals are entitled to little weight for the reasons set forth above.[25]

On the basis of the foregoing and all the other facts and circumstances, we conclude petitioners have not shown that the value of the Demco nonvoting common stock, as of the date of the gifts, was less than $260.13 per share. To the contrary, the record establishes that it was at least equal to that amount.

To reflect all the foregoing,

<u>Decisions will be entered</u>

<u>for respondent</u>.

---

[25] We also note that both experts' income-based analyses probably understated Demco's value, because they determined Demco's future cash-flows on a hypothetical after tax basis, and then used market rates of return on taxable investments to determine the present value of those cash-flows. See <u>supra</u> notes 19, 23.