T.C. Memo. 2003-251

UNITED STATES TAX COURT

JOHANN T. AND JOHANNA HESS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10468-01.                    Filed August 20, 2003.

<u>Timothy C. Frautschi</u> and <u>Maureen A. McGinnity</u>, for
petitioners.

<u>George W. Bezold</u> and <u>Mark J. Miller</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined a deficiency of $261,950
in petitioner Johann Hess's Federal gift tax for taxable year
1995.  Respondent also determined a deficiency of $261,950 in
petitioner Johanna Hess's Federal gift tax for taxable year 1995.
The issue for decision is the fair market value under section

2501[1] of 10 shares of stock in a certain company, Hess Industries, Inc., that Mr. Hess gave to an irrevocable trust for the benefit of his daughter.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time of filing the petition, petitioners resided in Granger, Indiana. Petitioners are husband and wife.

Petitioners owned stock in Hess Industries, Inc. (HII). HII is a closely held C corporation, which was formed in July 1977. HII, through its subsidiaries, primarily manufactures metal processing machines and automation systems for the automotive industry. The industry in which HII and its subsidiaries operates is cyclical. HII's principal customer markets (automotive and steel processing) are also cyclical. HII relies heavily on long-term contracts for special machines that take more than a year to complete. It builds special machines, often one-of-a-kind. HII acquires its business on the basis of bids. HII's sales and earnings are erratic and not readily predictable.

HII operates on a fiscal and taxable year ending on July 31 of each year. Through 1995, HII accounted for its sales on a

---

[1]All section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

completed contract basis, meaning a sale is not booked until 95 percent of the costs of the contract are expended and the equipment is substantially complete.

As of November 1995, HII held stock in four subsidiaries: Hess Engineering, Inc. (HEI), Capital Technologies, Hess MAE, and X-Cel Steel Fabricating. HEI is a wholly owned subsidiary of HII.[2] It is HII's largest subsidiary, and it operates as a consulting engineering firm, engages in the business of designing special machines, and also manufactures equipment for the steel wheel and metal process industries. Capital Technologies, the second largest subsidiary, builds tools and dies for the automotive and appliance industries, and also builds factory automation systems for the automotive industry. Hess MAE builds straightening machines and spin-forming lathes. X-Cel Steel Fabricating fabricates and supplies steel weldments and burnouts for the machine building industries, including HII's affiliates.

In February 1977, HEI hired Fritz Kucklick as vice president of sales and service. Mr. Kucklick had previously worked with Mr. Hess at Grotnes Machine Works, where Mr. Hess was the director of engineering and Mr. Kucklick was a project engineer. Mr. Kucklick assumed responsibility at HEI for application engineering; preparation of quotations, cost estimates, and

---

[2]Between 1977 and 1995, HII made a number of acquisitions, and the company grew to 400 employees.

customer presentations; and service. Mr. Hess's responsibilities were product design, purchasing, production, oversight, and general management. From the outset of Mr. Hess's and Mr. Kucklick's discussions regarding HEI's employment of Mr. Kucklick, they agreed that Mr. Kucklick would have the opportunity to purchase stock to become an owner in HEI. Mr. Kucklick entered into an employment agreement, which gave him the option to purchase up to 25 percent of HEI stock. In 1977, Mr. Kucklick purchased 12 shares of HEI stock. At that same time, Mr. Kucklick and Mr. Hess entered into an agreement to exchange all of their shares of HEI stock for an equal number of shares of HII stock. Mr. Kucklick then became an officer and director of HII.

From 1979 to 1989, Mr. Kucklick had primary responsibility for both HEI's and HII's customer relationships. He was the point man for all domestic and international customers, traveled extensively, and got to know the customers personally. Mr. Kucklick was also intimately involved in establishing pricing formulas.

Mr. Hess, Mrs. Hess, Mr. Kucklick, and HII executed a stockholders agreement (the stockholders agreement) dated September 1, 1989. The stockholders agreement restricted the transfer of HII's stock by the shareholders. It provided a right of first refusal in favor of HII and the other shareholders

before a shareholder could transfer his or her stock.  The

agreement also provided, regarding the purchase price:

> d.  <u>Determination of Purchase Price</u>.  Except as
> otherwise provided in this Agreement, the Corporation
> and each Stockholder agree that the purchase price per
> share for the Shares of any Stockholder sold and
> purchased pursuant to this Agreement shall be (i) in
> the case of a bona fide offer by a third party, the
> price offered by the prospective purchaser named in the
> Offer to Sell (the "Offer Price") or (ii) in all other
> circumstances, the Adjusted Value Per Share determined
> pursuant to Subsection 2.d.(2) hereof.

> *    *    *    *    *    *    *

> (2)  <u>Adjusted Value Per Share</u>.  The "Adjusted
> Value Per Share" is equal to X divided by Y,
> where:

>> "X" is an amount equal to the greater of (i)
>> eight times the average earnings of the
>> Corporation before taxes for the
>> Corporation's three most recent fiscal years
>> ending on the Valuation Date, as determined
>> in accordance with generally accepted
>> accounting principles consistently applied,
>> or (ii) two times the net worth of the
>> Corporation as of the Valuation Date,
>> determined in accordance with Subsection
>> 2.d.(3) hereof; and

>> "Y" equals the number of issued and
>> outstanding shares of common stock of the
>> Corporation as of the Valuation Date.

The agreement provided, however, that HII and its stockholders

could agree in writing among themselves to a specified value per

share to govern purchases for the time period specified in the

written agreement.[3]  The initial employment agreement with Mr.

---

[3]The stockholders agreement was applicable only in the
(continued...)

Kucklick contained a covenant by Mr. Kucklick not to compete with HEI during the term of his employment and for 2 years thereafter at any location within a 300-mile radius of South Bend, Indiana. This 2-year covenant not to compete remained in effect under the stockholders agreement.

In the 1990 time frame, approximately 50 percent of HII's overall sales and 80-90 percent of its overall earnings were attributed to HEI. In 1990, Mr. Kucklick became president of HEI and was responsible for the management and operation of that subsidiary. At that time, Mr. Hess's responsibilities shifted to HII's other subsidiaries. Customer relationships continued to be one of Mr. Kucklick's major strengths, and he remained very involved in sales for HEI. He was recognized as one of the foremost experts in the field of wheel-making manufacturing, and under his leadership, HEI had received a number of prestigious awards.

In the second half of 1994, Mr. Kucklick told Mr. Hess that he wanted to sell his shares of HII stock and plan for his retirement. In November 1994, Mr. Hess and Mr. Kucklick

---

[3](...continued)
limited circumstances identified in the agreement. One of the principal circumstances identified in the agreement was the death of one of the shareholders. In that circumstance, the shareholder's heirs or estate would receive a put to the corporation for the formula price stated in the agreement.

personally negotiated the basic terms of a transaction[4] whereby: (a) HII would redeem Mr. Kucklick's stock; (b) Mr. Kucklick would enter into an employment agreement; (c) Mr. Kucklick agreed to a covenant not to compete; and (d) Mr. Kucklick would be paid $4 million.[5] The price to be paid in this transaction was not determined by, and did not involve, an appraiser, and it was not determined by reference to the pricing formula in the stockholders agreement.

On February 26, 1995,[6] Mr. Hess and Mr. Kucklick contemporaneously entered into three formal agreements to memorialize the terms of their deal: (1) A redemption agreement (the redemption agreement); (2) an employment agreement (the employment agreement); and (3) an unsecured installment note (the installment note).

The redemption agreement provided for the redemption of Mr. Kucklick's shares and included the covenant not to compete and

---

[4]Mr. Hess and Mr. Kucklick were not represented by attorneys until the basic terms of this transaction were put into writing.

[5]In agreeing to pay this amount, Mr. Hess testified that he took into consideration: (1) Mr. Kucklick's longstanding (18 years) service, contributions, and self-sacrifice toward the growth and success of the company; (2) Mr. Kucklick's belief that he had overpaid for shares relative to Mr. Hess's investment; and (3) Mr. Hess's desire to make a payment that was fair to Mr. Kucklick on which he could live comfortably and that the company could afford.

[6]On Feb. 26, 1995, Mr. Hess held 80 shares, Mrs. Hess held 20 shares, and Mr. Kucklick held 12 shares of the outstanding stock of HII.

Mr. Kucklick's agreement to enter into an employment agreement. The redemption agreement required HII to pay Mr. Kucklick $1 million at closing and to deliver the installment note in the principal amount of $2,953,642.56 for the balance, a total payment of $3,953,642.56.[7]  The redemption agreement terminated the stockholders agreement.

The redemption agreement contained an 8-year, worldwide covenant not to compete (the 8-year covenant) to commence after Mr. Kucklick retired from HII and its subsidiaries.  The duration and the scope of the 8-year covenant were very important provisions to Mr. Hess and HII.  Mr. Hess believed that the 8-year covenant was important to him, because Mr. Kucklick was still relatively young,[8] and with his knowledge and contacts, he could set up a competing company, he could consult, and he could be a partner in, or work for, another company.  Mr. Hess believed that without the 8-year covenant, Mr. Kucklick could have done considerable damage to HII, perhaps resulting in millions of dollars in lost profits in a relatively short time period.

With respect to the duration of the 8-year covenant, Mr. Kucklick originally wanted it to cover the period of his employment and 2 years thereafter, the same duration as the

[7]Mr. Hess derived the total payment by reducing his $4 million offer to reflect an increase in the interest rate for the installment note.

[8]Mr. Kucklick was approximately 50 years old in 1994.

parties' previous agreements.  Mr. Hess, on the other hand, insisted that the covenant extend 8 years after the termination of Mr. Kucklick's employment.  With respect to the scope of the covenant, Mr. Kucklick originally wanted to be able to sell technical consulting services to rim, wheel, or ring manufacturers worldwide, other than direct competitors of HII.  Mr. Kucklick also proposed that the covenant not to compete apply only to machinery, not machine tools, and only to the extent that HII was manufacturing such machinery as of the termination of Mr. Kucklick's employment.  In contrast, Mr. Hess insisted that Mr. Kucklick disclose in advance the nature and duration of his proposed consulting services and that HII retain the right to veto any such agreement.  He also insisted on a much broader worldwide covenant not to compete covering all products manufactured or marketed by HII or any of its subsidiaries.  The restrictions that Mr. Hess insisted upon were reflected in the redemption agreement.

The employment agreement provided that Mr. Kucklick would work full time for HII for 3 years at a base salary of $135,000 per year.  Mr. Kucklick would continue as president of HEI subject to HII's discretion to reassign him.  Mr. Kucklick retired from his employment with HII and its subsidiaries in 1998, after he completed the 3-year period specified in the employment agreement.

The installment note obligated HII to pay the principal of $2,953,642.56 in 12 equal quarterly installments, with interest accruing at 6.5 percent. The 6.5-percent interest rate specified in the installment note was below the prevailing market rate of 9 percent. The note was for a period of 3 years.

Mr. Hess and Mr. Kucklick treated the redemption, the employment agreement, and the 8-year covenant as a package deal. They did not separately negotiate the value of Mr. Kucklick's shares and the value of the 8-year covenant, nor did they ever discuss making any separate payment for, or allocation of the amount paid for, that covenant. The redemption agreement, which was executed on February 26, 1995, did not specifically allocate any of the purchase price to the 8-year covenant, and it did not provide for separate consideration. It provides:

> THEREFORE, in consideration of the mutual agreements and covenants set forth herein, the sufficiency of which consideration is expressly acknowledged, the parties agree as follows:
>
> 1. Redemption of Shares. At the closing on the Closing Date * * *, Kucklick will surrender to the Corporation certificate number 2, representing the Shares, and the Corporation shall repurchase and redeem the Shares for the consideration set forth below. Such repurchase is a complete redemption of all of the stock of the Corporation owned by Kucklick and is intended to qualify as a complete redemption pursuant to the provisions of Section 302(b)(3) of the Internal Revenue Code of 1986, as amended * * *
>
> 2. Payment for Shares. In full payment for the Shares and in complete termination of Kucklick's entire equity interest in the Corporation, at the closing on the Closing Date, the Corporation shall pay to Kucklick

the aggregate sum of $3,953,642.56 (the "Redemption Price"), payable as follows:

    (a)  The sum of $1,000,000 by check; and

    (b)  By delivery of the Corporation's unsecured installment note (the "Note") in the principal amount of $2,953,642.56.  The Note shall be in the form of Exhibit A hereto.

HII and Mr. Kucklick have consistently treated the price paid under the redemption agreement as paid exclusively for the 12 shares of stock that were redeemed.  Thus, HII has treated the price paid as the cost of treasury stock, and Mr. Kucklick has treated it as a capital gain.

 HII's consolidated and consolidating financial statements for its years ended July 31, 1994, and 1995 include projections for the years ending July 31, 1996, through 1998.  HII prepares financial projections as a normal practice to motivate its employees.  HII's philosophy in establishing projections is to provide goals that will take a lot of effort to achieve.  The projections typically are made on the basis of information from the subsidiaries regarding outstanding quotations without considering customers' price negotiations.  The projections typically cover a period of 12 to 18 months into the future.  However, the projections that HII prepared for the years ending July 31, 1996, and 1998 cover a period of 3 years and are not made on the basis of input from HII's subsidiaries.  The purpose of HII's projections for 1996 to 1998 was to "pump up the

troops," demonstrating to employees what they could earn in bonuses, deferred income, and profit sharing under a new plan if they worked hard, HII had a lot of luck, and everything fell into place.

HII's projections historically have been unreliable, particularly with respect to net income, because of the difficulty in predicting the costs to complete contracts for large custom machines.[9]  HII's projections were even more unreliable for the years 1996 through 1998.  HII did not use the 1996-98 projections for purposes of analyzing cashflow to finance plant expansion.  Instead, it greatly reduced net income in its cashflow analysis because it knew the goals in the projections probably would not be reached.

On paper, HII had an outstanding year in 1995, exceeding by more than $2 million its budgeted sales of $62.23 million.  HII

---

[9]For example, HII originally budgeted net income for the fiscal year ending July 31, 1992, at $4,287,948.  For the first 6 months of that fiscal year, its actual net income was only $973,917.  HII made a midyear adjustment of budgeted net income to $2,809,895.  Its actual net income for the fiscal year ending July 31, 1992, was $1,851,347 (only 43 percent of the original budgeted net income and 66 percent of the midyear adjusted net income).  For the fiscal year ending July 31, 1994, HII budgeted first quarter net income at $597,655.  It actually suffered a loss of $282,794 for the first quarter.  For the first 6 months of fiscal year 1994, HII had a net loss of $293,890, as opposed to budgeted net income of $1,186,800.  At the end of 8 months, HII had net income of $82,044, as compared with budgeted net income for that period of $2,384,217.  For fiscal year 1995, HII's budgeted net income was $5,380,000.  Its actual reported net income was $4.17 million, a shortfall of 22 percent.

realized net income of $4.17 million as compared with budgeted net income of $5.38 million.  As of November 15, 1995, the first quarter financial results for fiscal year 1996 were available. HII's business plan for fiscal year 1996 called for approximately $77 million in revenue, building upon the record year in 1995. HII actually realized only $3 million in revenues for the first quarter.  Further, although HII had forecast an annual net profit of approximately $7 million for fiscal year 1996, it actually had a net loss of $700,000 for the first quarter.

On November 15, 1995, Mr. Hess gave 10 shares of HII stock to an irrevocable trust for the benefit of his daughter.  Under section 2513, petitioners elected to treat Mrs. Hess as the donor of one-half of the gift of stock that Mr. Hess had made.[10] Petitioners filed Forms 709, U.S. Gift (and Generation-Skipping Transfer) Tax Return, for their taxable year 1995.  The gift tax returns that petitioners filed reported the fair market value of the HII stock to be $120,000 per share at the time of the gift.

Respondent issued gift tax statutory notices of deficiency to Mr. Hess and Mrs. Hess for their taxable year 1995. Respondent determined that the value of the HII stock on November 15, 1995, was $253,000 per share.

---

[10]Immediately before the gift, 100 shares of HII stock were outstanding of which Mr. Hess owned 80 shares and Mrs. Hess owned 20 shares.

OPINION

This case involves the valuation for gift tax purposes of 10 shares of the outstanding stock of a closely held C corporation. Under section 2501(a)(1), a tax is imposed for each calendar year on the transfer of property by gift during such calendar year by any individual. If the gift is made in property, the value of the property at the date of the gift shall be considered the amount of the gift. Sec. 2512(a). The value of property for gift tax purposes is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts.[11] Sec. 25.2512-1, Gift Tax Regs.

Generally, in valuing shares of a closely held corporation, actual arm's-length sales of stock in the normal course of business within a reasonable time before or after the valuation date are the best indicators of fair market value. Estate of

_____

[11]The willing buyer and willing seller are hypothetical persons, rather than specific individuals or entities, and their characteristics are not necessarily the same as those of the donor and the donee. McCord v. Commissioner, 120 T.C. 358, 373 (2003). The hypothetical willing buyer and seller are presumed to be dedicated to achieving the maximum economic advantage. Estate of Curry v. United States, 706 F.2d 1424, 1429 (7th Cir. 1983). This advantage must be achieved in the context of market conditions, the constraints of the economy, and the financial and business experience of the corporation existing at the valuation date. Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990).

Andrews v. Commissioner, 79 T.C. 938, 940 (1982).[12]  However,

where actual sales prices are unavailable, the value of the

shares is determined by taking into account the company's net

worth, prospective earning power and dividend-paying capacity,

and other relevant factors.[13]  Sec. 25.2512-2(f), Gift Tax Regs.;

see also Rev. Rul. 59-60, 1959-1 C.B. 237.  These factors cannot

be applied with mathematical precision, and, therefore, the

weight to be given to each factor must be tailored to account for

the particular facts of each case.  Estate of Andrews v.

Commissioner, supra at 940-941.

As is often the case where the value of stock in a closely

held corporation is at issue, the separation in the values that

the parties and their experts argue is substantial.  The gift tax

returns that petitioners filed reported the fair market value of

a minority interest in HII stock as $120,000 per share.[14]  In the

---

[12]Since the same factors are used for gift and estate tax
purposes in determining the fair market value of property, we
cite both gift and estate tax cases.  See Ward v. Commissioner,
87 T.C. 78, 101 (1986); Estate of True v. Commissioner, T.C.
Memo. 2001-167.

[13]The regulations provide that some of the "other relevant
factors" to consider are:  The goodwill of the business; the
economic outlook in the particular industry; the company's
position in the industry and its management; the degree of
control of the business represented by the block of stock to be
valued; and the values of securities of corporations engaged in
the same or similar lines of business which are listed on a stock
exchange.  Sec. 25.2512-2(f), Gift Tax Regs.

[14]The gift tax values which petitioners reported on their
(continued...)

statutory notices of deficiency issued to Mr. Hess and Mrs. Hess, respondent determined that the fair market value of HII stock was $253,000 per share on the date of the gift. Petitioners' expert, Gregory S. Heebink, concluded that the fair market value of HII stock was $128,000 per share. Respondent's expert, Eric Engstrom, concluded that the fair market value of HII stock was $269,000 per share.[15]

We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of sound judgment. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). Further, we are entitled to accept the opinion of one party's expert over the opinion of the other party's expert, and we are also entitled to accept certain portions of the opinion of an expert while rejecting the remaining portions. McCord v. Commissioner, 120 T.C. 358, 374 (2003). Moreover, the figure at which we arrive need not be directly traceable to specific

---

[14](...continued)
gift tax returns were made on the basis of an appraisal by Gary G. Gaynor, petitioners' and HII's accountant and tax adviser. Mr. Gaynor concluded that the fair market value of a minority interest in HII's stock as of July 31, 1995, was $120,000 per share. Petitioners request that we consider Mr. Gaynor's conclusion because he was very familiar with HII's business. We do not consider Mr. Gaynor's conclusion in our determination of the value of the HII shares. Mr. Gaynor was not offered as an expert, his report was not accepted as the report of an expert witness, and he did not testify at trial.

[15]Respondent does not request that we find an additional deficiency on the basis of his expert's conclusion.

testimony if it is within the range of values that may be properly derived from consideration of all the evidence.  Id.
After considering the parties arguments, all the facts and circumstances relevant to this case, and the opinions of petitioners' and respondent's experts, we conclude that the fair market value of the shares of HII stock that Mr. Hess gave to the trust falls somewhere in the middle of the range of values suggested by the parties and their experts.[16]

Mr. Heebink's Expert Opinion

Mr. Heebink arrived at a value of $128,000 per share for the HII stock.[17]  His valuation relied upon a discounted cashflow analysis and a market comparable analysis.  However, as we explain in more detail below, Mr. Heebink's valuation analysis relies upon an adjustment to HII's financial information, which resulted in a significant decrease in HII's earnings figures for

[16]Generally, the Commissioner's determination of fair market value bears a presumption of correctness, and the burden of proving that determination is incorrect rests with the taxpayer. See Rule 142(a).  However, in certain circumstances, the burden of proof as to that determination shifts to the Commissioner under sec. 7491(a).  Petitioners do not argue that sec. 7491(a) applies, and the record does not disclose the date the examination commenced.

[17]Mr. Heebink prepared four reports for this case.  He determined the fair market value of HII shares as of Nov. 11, 1995; he prepared a supplemental report in which he addressed items that respondent's expert relied upon in his report; he valued HII shares as of Feb. 26, 1995, the date the redemption agreement was executed; and he valued the 8-year covenant as of that date.

its 1995 fiscal year.  Since we conclude that this adjustment should not have been made, Mr. Heebink's valuation analysis significantly understates the value of HII stock.

For HII's 1995 fiscal year, Mr. Heebink adjusted HII's cost of sales upward and thus its earnings figures downward by approximately $2.5 million.  He used this adjusted cost of sales in developing his cost of sales assumption for his discounted cashflow analysis and the adjusted earnings amount in his market comparable analysis.  This adjustment was made on the basis of information contained in a 1997 memorandum from personnel at HII to Mr. Heebink regarding a purported overstatement of 1995 income attributable to an alleged understatement of reserves for expenses associated with machine construction projects for 1995. We cannot agree that Mr. Heebink properly adjusted earnings to account for the alleged understatement.

Petitioners have not established the existence of an understatement of reserves for 1995, the nature of the understatement, or its amount.  We cannot conclude from the evidence presented that a hypothetical buyer or seller would have discovered, or even considered, the understatement of reserves in 1995, at the time of the gift.  Indeed, the 1997 memorandum from HII personnel that Mr. Heebink relied upon in making the adjustment states rather equivocally:

Dear Mr. Heebink:

The Actual Income reported for 1995 was probably overstated, based on additional costs incurred over amounts reserved on jobs reported as Sold/Shipped at the end of the year. We have attempted to quantify what those impacts might have been based on an outlook as of November 11, 1995. In addition, since the 1996 forecast was based on 1995 results, that forecast was overly optimistic.

HII's financial statement for 1995 was not restated to reflect the alleged understatement of reserves.[18] HII's income tax return for 1995 was not amended to reflect the alleged understatement. HII had a substantial tax liability for its 1995 fiscal year. HII reported taxable income of $5,990,541 and a total tax of $2,042,501. HII's 1995 return was prepared by Mr. Gaynor in or about November 13, 1995. Any additional expenses represented by the alleged reserves were deducted in later years.

The alleged understatement was not discovered by HII's accountant, Gary Gaynor, in his appraisal of HII as of July 31, 1995, and even petitioners admit that the alleged understatement

---

[18]Petitioners allege that HII did not restate its financial statement for 1995 because bonuses and profit sharing had been paid to employees on the basis of the originally reported results, and management did not want to penalize employees and destroy morale based on errors and misstatements by a few people. Petitioners also allege that HII did not want to incur the expense of redoing its financial statements and audits. However, petitioners do not explain how HII's employees would have been affected by a restatement. We are not satisfied that this factor and the expense of redoing the financial statements and audits fully explain HII's failure to restate its financial statement considering the extent of the alleged understatement of reserves and the resulting overstatement of earnings.

was not quantified by HII management at the time of the gift.[19] Petitioners fail to convince us that the alleged understatement was known or knowable as of the gift date. Further, as a general rule, subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable at the date of valuation. First Natl. Bank of Kenosha v. United States, 763 F.2d 891, 894 (7th Cir. 1985); Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987). The record reflects that the alleged understatement was not discovered or quantified until 1997, almost 2 years after the gift of HII stock and after the audit of petitioners' gift tax returns. On the basis of the evidence in the record, we are not convinced that the discovery of the alleged understatement was reasonably foreseeable on the gift date.[20]

The adjustment proposed in the 1997 memorandum should not have been considered in valuing the HII stock.[21] Making this

---

[19]Petitioners allege that HII management informally recognized the understatement of reserves as of Nov. 15, 1995, but they had not quantified the amounts. They allege that the understatement would have been discovered and quantified by an investor conducting due diligence as of the date of the gift. We are not convinced that due diligence or any other investigation would have sufficiently disclosed the alleged understatement.

[20]Mr. Engstrom testified that, in his opinion, the adjustment was not foreseeable as of the valuation date.

[21]Petitioners also allege that HII failed to follow the substantial completion accounting rules in booking its sales for 1995; i.e., it booked sales prematurely. They claim that if
(continued...)

adjustment resulted in a significant understatement of the value that Mr. Heebink derived in his valuation analysis. Nevertheless, we believe Mr. Heebink's valuation analysis is entitled to some consideration. Although his valuation analysis should not have included the adjustment for the alleged understatement of reserves, that analysis provides some indication of the fair market value of HII stock. Mr. Heebink's analysis was thorough, and his investigation leading up to that analysis included a site visit and interviews with HII personnel. Mr. Heebink prepared additional reports to supplement his principal report.

Further, Mr. Heebink's valuation analysis, unlike Mr. Engstrom's analysis, gave consideration to an income-based method, the discounted cashflow method. Generally, in valuing the shares of an operating company such as HII, primary consideration should be given to earnings. See Rev. Rul. 59-60,

---

[21](...continued)
HII's 1995 financial statement had been restated to correct these errors and to account for the understatement of reserves, HII's pretax income would have been reduced by approximately $3.5 million. Petitioners fail to convince us that there was a premature booking of income or that the premature booking of income was known or reasonably foreseeable on the valuation date. Further, it does not appear that these alleged errors were identified until trial, and Mr. Heebink did not make any adjustments with respect to any premature booking of income in his reports. These alleged errors were not discovered by Mr. Gaynor. HII's financial statement for 1995 was not restated, and its income tax return for 1995 was not amended to reflect these errors.

sec. 5(a), 1959-1 C.B. at 242. However, respondent argues that the discounted cashflow method should not be used where future income is unpredictable, as with HII, and "the results of such an analysis provide little, perhaps no, indication of value and should be accorded like weight." We agree that an income-based method, such as the discounted cashflow method, is not particularly reliable where the subject company's future income is relatively unpredictable. See Wall v. Commissioner, T.C. Memo. 2001-75; Pratt et al., Valuing Small Businesses and Professional Practices 257 (3d ed. 1998). Petitioners agree that HII's sales and earnings are erratic and not readily predictable. Given these circumstances, we are not convinced that the value Mr. Heebink derived under the discounted cashflow method is entitled to the weight that he gave to it. However, we believe Mr. Heebink's conclusions with respect to the discounted cashflow analysis are entitled to some consideration.[22]

---

[22]Mr. Engstrom gave no weight to the discounted cashflow method because small changes in certain assumptions resulted in large changes in the value of HII shares. Indeed, Mr. Engstrom opined that if HII's expenses were increased or decreased by 1 percent of sales, it would result in a $67,000 per share increase or decrease in the value of HII shares. He also opined that a 1-percent increase in the discount rate would cause the implied value to go down by $21,000 per share; a 1-percent decrease in the discount rate would cause the implied value to go up by $26,000 per share; and a combination of a decrease in expenses by 1 percent of sales and a 1-percent decrease in the discount rate would result in the implied value to go up by about $100,000 per share. As we explain later on, we do not agree that this requires us to completely reject the discounted cashflow method

(continued...)

Another factor which makes Mr. Heebink's analysis less persuasive is his application of a minority interest discount to the total business enterprise value he determined in his analysis. A significant component of this total business enterprise value is attributable to his market comparable analysis. Applying a minority interest discount to the market comparable analysis, which already reflects transactions involving minority interests, is inappropriate. See Estate of Mitchell v. Commissioner, T.C. Memo. 2002-98 (if the stock to be valued by the market approach represents a minority interest, no discount for the lack of control is applied because the method reflects a minority interest).

We do not agree with respondent that Mr. Heebink's discounted cashflow analysis is entitled to no consideration. We will consider Mr. Heebink's valuation analysis, bearing in mind the circumstances identified above, especially the fact that his analysis significantly understated the value of HII stock in making the erroneous adjustment for the alleged understatement of reserves.[23]

---

[22](...continued) in valuing HII stock. However, we agree that it detracts from the persuasiveness of Mr. Heebink's conclusions.

[23]Mr. Heebink does not present an alternative valuation which does not contain this adjustment; however, it is clear that this adjustment, if corrected, would bring Mr. Heebink's conclusions considerably closer to those of Mr. Engstrom's.

(continued...)

Mr. Engstrom's Expert Opinion

Mr. Engstrom concluded that the fair market value of a minority interest in the common stock of HII, as of November 15, 1995, was $269,000 per share.[24]  He relied upon four valuation methods, and he applied varying weights to the per share values computed under those methods, to arrive at the fair market value of $269,000 per share:

| Valuation Method | Per Share Value | Weight Applied |
|---|---|---|
| Net asset value method | $119,000 | 10% |
| Prior stock transaction method | 329,500 | 40 |
| Stockholder agreement method | 380,000 | 10 |
| Guideline public company method | 219,000 | 40 |

---

[23](...continued)
Indeed, respondent points out that the adjustment for the alleged understatement accounts for the biggest difference between the values derived by Mr. Heebink in his market comparable analysis and by Mr. Engstrom in his guideline companies analysis. Respondent submits that without this adjustment, HII's debt-free earnings would have increased by approximately $1.5 million ($2.46 million x 39-percent income tax rate) to a total of $3.9 million ($2,434,000 + $1.5 million); after applying his current earnings multiplier of 10.7 to the $1.5 million increase, total enterprise value would have increased approximately $16 million or $160,000 per share before discounts; and its per share value would have increased to $223,000 after applying a 15-percent minority discount and a 30-percent marketability discount.

[24]The report that Mr. Engstrom prepared was the second report that Philip Schneider & Associates, Inc., prepared for respondent.  The first report arrived at a value of $253,000 per share, the amount that respondent determined in the statutory notices of deficiency issued to petitioners.

We discuss these valuation methods in turn.

Net Asset Value Method

Mr. Engstrom used the net asset value method[25] as an asset-based approach to his valuation of HII stock.  Mr. Engstrom assumed that the book value of HII's assets and liabilities provided a reasonable approximation of fair market value.  He determined that the fair market value of the stockholders' equity in HII was $18,640,000 (book value) on a controlling, marketable basis as of November 15, 1995.

Both parties agree that the value Mr. Engstrom derived under the net asset value method provides some indication of the fair market value of HII stock on the gift date.  However, they disagree regarding the weight to be given that value.  Mr. Engstrom applied only 10-percent weight to his net asset value analysis because he concluded that HII "is a very profitable company, and it appears that the company had a significant amount of goodwill as of November 15, 1995."  Petitioners argue that Mr. Engstrom's net asset value analysis supports the value they reported on their gift tax returns, and they suggest that the value derived under that analysis is entitled to more weight than was given in Mr. Engstrom's report.

---

[25]The net asset value method is based upon the net value of a company's assets less liabilities, after adjusting both to fair market value using a going-concern assumption.

In valuing stock of a closely held corporation, one of the factors to be considered is the book value of the stock. See Rev. Rul. 59-60, sec. 4.01(c), 1959-1 C.B. at 238. Thus, the value derived under the net asset value method is entitled to some weight in valuing HII stock. However, in deciding the relative weight to give to the net asset value in valuing a corporation, we must consider the extent to which the company is actively engaged in producing income as opposed to simply holding property for investment. See Estate of Andrews v. Commissioner, 79 T.C. at 945; Estate of Ford v. Commissioner, T.C. Memo. 1993-580, affd. 53 F.3d 924 (8th Cir. 1995). If the company is an operating company as opposed to a holding company, the net asset value method should be accorded less weight. See Ward v. Commissioner, 87 T.C. 78, 102 (1986).

HII and its subsidiaries represent an ongoing business actively engaged in producing income as opposed to simply holding assets for investment. HII was relatively profitable in the years leading up to the valuation date. Indeed, HII experienced a "banner year" in fiscal year 1995 with $64.25 million in sales and $4.17 million in net income. The financial information for the prior fiscal years indicated that HII was a growing company, and HII's financial projections reflected that HII expected to expand upon its growth and profitability in the years that followed the gift. Under these circumstances, the net asset

value is not particularly reflective of the fair market value of HII stock. Although we agree with petitioners that the net asset value is entitled to some weight in valuing HII, the net asset value method in this case fails to identify other elements of value in HII which we believe a hypothetical buyer and seller would have considered as of the gift date. For example, we are convinced that HII had a significant element of intangible value in its goodwill.[26]

---

[26] "The essence of goodwill is a preexisting business relationship founded upon a continuous course of dealing that can be expected to continue indefinitely." Canterbury v. Commissioner, 99 T.C. 223, 247 (1992) (citing Computing & Software, Inc. v. Commissioner, 64 T.C. 223, 233 (1975)). It is the value of a trade or business that is attributable to the expectancy of continued customer patronage. Boe v. Commissioner, 307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961); sec. 1.197-2(b)(1), Income Tax Regs. Respondent requests that we find as fact, and petitioner agrees, that HII acquires its business on the basis of bids without much continuing or recurring customer relationships. Petitioners point to this requested finding and suggest that HII did not have a significant amount of goodwill. However, petitioners also argue in the context of the redemption transaction, and Mr. Hess's testimony makes clear, that HII had established customer relationships through Mr. Kucklick, and Mr. Kucklick could have exploited those relationships if he had left HII. We find HII had a considerable element of goodwill or other intangible value. See Rev. Rul. 59-60, sec. 4.02(f), 1959-1 C.B. at 241:

> While the element of goodwill may be based primarily on earnings, such factors as the prestige and renown of the business, the ownership of a trade or brand name, and a record of successful operation over a prolonged period in a particular locality, also may furnish support for the inclusion of intangible value. * * *

Stockholders Agreement Method

Mr. Engstrom relies upon the valuation formula contained in the September 1, 1989, stockholders agreement as an indication of the fair market value of HII stock. Applying the valuation formula, he determined that the value of the company was equal to $38 million, or $380,000 per share,[27] as of November 15, 1995. This amount represents the value he derived under the net worth (book value) formula; i.e., the higher value derived under the formula in the stockholders agreement.

Respondent argues that although the redemption agreement terminated the stockholders agreement, the values derived under it reflect an agreed methodology for establishing fair market value between knowledgeable parties and as such are part of the facts and circumstances that may be taken into consideration in

---

[27]Mr. Engstrom determined that the valuation formula would most likely be applied to transactions involving minority interests, because the owner of a controlling interest would most likely liquidate his ownership interest through a sale of the entire company. Mr. Engstrom opined that the formula price, 2 times book value, contained built-in marketability and minority interest discounts. We are not persuaded that this is the case. The formula provision by its terms applies to both the majority shareholder, Mr. Hess, and the minority shareholder, Mr. Kucklick, in the circumstances specified in the agreement. We also point out that Mr. Engstrom applied discounts in his net asset value analysis. Respondent submits that the indicated value under the stockholders agreement would be $242,250 ($380,000 x .85 x .75), if the discounts determined by Mr. Engstrom were applied.

establishing value.[28]  Mr. Heebink did not consider the formula in the stockholders agreement in his valuation analysis. Moreover, petitioners contend that formula does not provide a reliable indicator of the fair market value of HII stock as of November 15, 1995.

A stockholders agreement which restricts the sale or transfer of stock is not determinative for gift tax purposes; however, it is a factor to be considered, with other relevant factors, in determining fair market value.  Rev. Rul. 59-60, sec. 8, 1959-1 C.B. at 243; see also Ward v. Commissioner, supra at 105; Estate of Lauder v. Commissioner, T.C. Memo. 1994-527.  We agree that the stockholders agreement provides some indication of value; however, we are convinced the value derived under the formula provision is much greater than the fair market value of HII stock.

First, the buy-sell agreement upon which respondent's expert relies was not in effect at the time of the gift.  That agreement was terminated as of the date of the redemption of Mr. Kucklick's shares on February 26, 1995.  No transactions ever occurred under the stockholders agreement.

---

[28]Mr. Engstrom testified that the valuation formula in the stockholders agreement, just like a prior stock transaction, would influence "people's opinion as to what the value of the stock is."

Also, the agreement was among Mr. Hess, Mrs. Hess, Mr.
Kucklick, and HII. It provided specific rights and obligations
with respect to those shareholders. It defined their
relationship as shareholders and accounted for factors peculiar
to that relationship. Although we disagree with petitioners'
contention that the agreement was not entered into at arm's
length, we do agree that factors, other than those factors that a
hypothetical buyer might consider, went into the agreement.
Indeed, Mr. Hess testified on this point:

> There were a couple of important points that took
> place at that time. First of all, my wife became--my
> wife, Johanna Hess, became a shareholder; therefore,
> she had to be included in a stockholder's agreement.
> Secondly, at that point, the company had grown in size
> very substantially and in net assets; we were able to
> afford to buy substantial life insurance on Mr.
> Kucklick's and my lives--the company was able to.
>
> And we wanted to make sure at that point in time
> that, first of all, both families would be taken care
> of in case of death of one of the partners and,
> secondly, also, that any stock repurchase by the
> company under the agreement would be done in a very
> orderly fashion--

Mr. Hess testified that the pricing formula allowed for a higher
price in the case of death of one of the shareholders which could
be funded in part with the life insurance proceeds.

It is also clear that the shareholders were not bound to the
value per share derived under the formula provision, since they
could agree in writing among themselves to a specified value per
share. Further, the stockholders agreement was applicable only

in the limited circumstances identified in that agreement. Principally, if any of the three shareholders had died, that shareholder's heirs or that shareholder's estate would have had a put to the corporation for the formula price under the agreement.[29] It is not at all clear whether the formula in the agreement applies to voluntary sales among shareholders. Respondent relies upon the phrase "in all other circumstances" which appears in the formula, and he contends that the formula clause applies to voluntary sales among shareholders as well as other sales and purchases. The formula covers only shares that are "sold and purchased pursuant to this Agreement". The agreement by its terms applies only to offers to sell arising from a shareholder's intent to transfer or encumber shares, deemed offers to sell in the case of bankruptcy or insolvency of a shareholder, and mandatory offers to sell coincident to the termination of a shareholder's employment by HII.[30]

In these circumstances, we cannot agree that the stockholders agreement is determinative of the fair market value of HII stock. We consider the value that Mr. Engstrom determined

---

[29]Respondent agrees the formula provision was binding only in certain circumstances not involved in this case.

[30]Mr. Kucklick referred to pricing formulas in negotiating for a higher price as part of the redemption transaction; however, the final purchase price was not determined on the basis of the pricing formula in the stockholders agreement.

under that agreement; however, we give it relatively little weight.

### Prior Stock Transaction Method

Mr. Engstrom relied upon the February 26, 1995, redemption of Mr. Kucklick's 12 shares of common stock. He concluded that since the redemption occurred in close proximity to the gift date for the HII shares, the purchase price of Mr. Kucklick's shares provided a reliable indication of the fair market value of HII stock. Mr. Engstrom concluded that the values of the 8-year covenant and the 3-year employment agreement were not material, and his valuation assumes that the entire purchase price in the redemption transaction was a payment for the 12 shares of common stock. Mr. Engstrom determined that the price that Mr. Kucklick received in the redemption transaction indicates that the fair market value of HII stock was approximately $329,500 per share as of November 15, 1995. Mr. Engstrom gave a significant amount of weight, 40 percent, to the value resulting from his prior stock transaction method. We agree with Mr. Engstrom that the proximity of the redemption transaction in relation to the gift of shares makes that transaction relevant to the question of fair market value of HII stock. See Rabenhorst v. Commissioner, T.C. Memo. 1996-92. However, we are not convinced that the value Mr. Engstrom derived from that transaction accurately reflects the value of HII stock.

First, it appears that at least some portion of the purchase price was attributable to the 8-year covenant. Mr. Kucklick posed a significant competitive threat to HII and its future profitability given his age, his experience in the metal forming and cutting industry, his knowledge, and his customer contacts. For these reasons, and to protect his investment in HII, Mr. Hess insisted upon a broad and relatively lengthy covenant not to compete. Although the parties did not specifically allocate any amount of the purchase price to the 8-year covenant, it is clear that this covenant was a key component of the agreement and represented valuable consideration coming from Mr. Kucklick. Mr. Hess testified with respect to the $3.95 million purchase price: "I considered the price basically a package deal for all the services past, for the stock, for the noncompete, for the employment, continuing employment and his willingness to train people at Hess Engineering during that time." He testified that the entire purchase price of $3.95 million was allocated to the redemption of Mr. Kucklick's shares to provide favorable tax treatment to Mr. Kucklick.[31]

---

[31]Respondent suggests that petitioners must present strong proof that the redemption agreement does not accurately reflect the agreement of the parties that nothing should be allocated to the 8-year covenant. Generally, taxpayers cannot ignore the unambiguous terms of a binding agreement, and they must present "strong proof" that an allocation of consideration in an agreement is other than that specified. Meredith Corp. & Subs. v. Commissioner, 102 T.C. 406, 438 (1994); Steel v. Commissioner,
(continued...)

Petitioners also argue that the redemption agreement was not entered into at arm's length, and, therefore, is not reflective of fair market value. We cannot agree with this contention. We do agree, however, that there were present considerations that would not be present if the seller in that transaction were not Mr. Kucklick and if the buyer were not HII. There were certain elements of consideration exchanged which cannot be quantified. We agree that the redemption transaction provides some indication of the value of HII stock; however, we are convinced that the particular circumstances of that transaction indicate that the value of HII stock was less than the value that Mr. Engstrom derived from that transaction.[32]

---

[31](...continued)
T.C. Memo. 2002-113; see also Kreider v. Commissioner, 762 F.2d 580 (7th Cir. 1985), affg. T.C. Memo. 1984-68. However, in the instant case, the agreement and the allocation therein represent a transaction which is entirely collateral to Mr. Hess's gift of HII shares and the valuation of those shares. We are not persuaded that the strong proof rule applies in these circumstances.

[32]Mr. Engstrom did not apply a minority interest discount to the value he derived from the redemption transaction, because he concluded that Mr. Kucklick's shares represented a minority interest in HII stock. Petitioners argue that the redemption of Mr. Kucklick's stock did not involve a minority interest, because Mr. Hess and Mr. Kucklick treated each other as equals in all aspects of their relationship at HII. However, the redemption was clearly of a minority interest in HII stock, regardless of whether Mr. Hess and Mr. Kucklick treated each other as equals. Further, there is evidence that they were not in fact equals in all such aspects. Indeed, the negotiations leading up to the redemption transaction suggest this much.

In Mr. Heebink's valuation analysis, he did not rely upon the transaction involving the redemption of Mr. Kucklick's shares. However, Mr. Heebink prepared two additional reports and a supplemental report, in which he concluded separate values for Mr. Kucklick's redeemed shares and the 8-year covenant. Mr. Heebink determined the value of the 8-year covenant using an income analysis estimating the opportunity losses (focusing on HEI) that would occur if Mr. Kucklick were allowed to compete. The opportunity losses were projected over an 8-year period beginning after the completion of the 3-year period of the employment agreement. Mr. Heebink applied a discount rate to discount the future cashflows he determined to present value. He concluded that the value of the 8-year covenant was $2 million. He allocated $2 million of the purchase price stated in the redemption agreement to the 8-year covenant, and he also allocated $100,000 to the favorable financing contained in the installment note. He determined that the redemption transaction reflected a value of $104,000 per share for HII stock after applying a 15-percent minority interest discount and a 30-percent marketability discount.

We find Mr. Heebink's attempts to quantify the value of the 8-year covenant flawed. His analysis fails to consider the intentions of the parties to that agreement, and, instead, he seeks to calculate the value of the covenant on the basis of

potential opportunity losses.  We are not persuaded that the parties considered the potential opportunity losses, that potential opportunity losses in this instance provide an acceptable measure of value for a covenant not to compete, and that Mr. Heebink's determinations and calculations of those opportunity losses are correct.[33]  We are not convinced that HII or a hypothetical "buyer" would pay the present value of potential opportunity losses for a covenant not to compete.  As Mr. Engstrom testified in rebuttal:  "if the projected losses were $2 million, then there'd be no reason why Hess would be willing to pay $2 million, because then they'd be in the same position they would have been in if the covenant had never been entered into in the first place."  Further, we are not convinced that HII would pay Mr. Kucklick a salary of only $135,000 per year during the 3-year term of the employment agreement, yet pay Mr. Kucklick $2 million for the 8-year covenant not to compete.  Again, as Mr. Engstrom testified:  "if he was willing to work full time for the company and not work for anyone else for $135,000 per year, there's no reason to believe you'd have to pay him substantially more than that to not work."

We are not persuaded by Mr. Heebink's attempts to quantify the value of the 8-year covenant.  We cannot agree that the 8-

---

[33]For example, Mr. Heebink's analysis assumes that HII would realize losses immediately upon Mr. Kucklick's leaving and competing against HII.

year covenant had a value of $2 million. Instead, we believe that the value of the 8-year covenant was less, and the value of the redeemed stock was much greater than the amounts determined by Mr. Heebink.

Guideline Companies Analysis

Mr. Engstrom also relied upon a guideline companies analysis based on comparisons with publicly traded stocks. He determined that the fair market value of HII stock was $29,197,000 on a minority, marketable basis. After applying a marketability discount of 25 percent, Mr. Engstrom determined the fair market value of HII stock to be $21.9 million, or $219,000 per share. He gave a significant amount of weight, 40 percent, to the value resulting from the guideline companies analysis.

In his guideline companies analysis, Mr. Engstrom relied solely on price/earnings ratios (P/E ratio(s)) to compare HII to the guideline companies.[34] Petitioners argue that Mr. Engstrom's use of P/E ratios to compare HII to the guideline companies was erroneous. They claim that P/E ratios are a "crude measure" for calculating value and do not consider important differences in interest levels, tax levels, and depreciation levels between the subject company (HII) and the guideline companies. Petitioners

[34]Mr. Engstrom determined the P/E ratios from Value Line Investment Survey, a publication that does not provide information for other measures of performance such as EBIT (earnings before interest and taxes) and EBITDA (earnings before interest, taxes, depreciation, and amortization).

contend that Mr. Engstrom should have used other measures of comparison besides P/E ratios.

We agree with petitioners that Mr. Engstrom's guideline companies method would have been more complete and more persuasive if it had employed additional measures of comparison. See Wall v. Commissioner, T.C. Memo. 2001-75. However, it is clear that P/E ratios bear a well-recognized relationship in the valuation of companies, Learner v. Commissioner, T.C. Memo. 1983-122, and Mr. Engstrom's reliance on P/E ratios was not inherently flawed.[35] Petitioners base their objections to Mr. Engstrom's analysis on his failure to consider certain pretax methods of comparison such as EBIT (earnings before interest and taxes) or

---

[35]The P/E ratios of publicly held companies do not compare to the P/E ratios of a closely held company if the companies themselves are not comparable. Learner v. Commissioner, T.C. Memo. 1983-122. Whether the stock price of one company with a given earnings stream will be similar to that of another company with the same earnings depends upon a wide variety of factors, including management policy, management ability, past performance, and dividend policy. Id. Although petitioners suggest that the guideline companies do not compare to HII, we point out that two of the four guideline companies used by Mr. Engstrom in his analysis, Giddings & Lewis, Inc., and Monarch Machine Tool Co., were companies used by HII to "benchmark" its performance; three of the four guideline companies used by Mr. Engstrom, Cincinnati Milacron, Inc., Giddings & Lewis, Inc., and Monarch Machine Tool Co., were also used by Mr. Heebink in his market comparable analysis; and the remaining company, Gleason Corp., builds machines for the manufacture of gears, and its major customers are in the automotive and truck industries. Mr. Engstrom made appropriate adjustments to the P/E ratios from the guideline companies to account for differences in size and net profit margins. With these adjustments, we find the companies selected by Mr. Engstrom comparable to HII.

EBITDA (earnings before interest, taxes, depreciation and amortization). However, they fail to explain how consideration of those measures would have influenced or changed Mr. Engstrom's conclusions.[36] Mr. Engstrom's explanations were thorough and complete, and it was his opinion that those measures would not have affected his analysis. He agreed that significant differences in interest, taxes, level of debt, etc., might necessitate adjustments to make the companies more comparable. However, imposing those adjustments where the differences are not significant runs the risk of imposing "your judgment over the actual data that's in there" and the risk "that your subjective determination is wrong."

The P/E ratios for the guideline companies that Mr. Engstrom selected were based on those companies' earnings for the two most recent quarterly filings and the forecasts of the earnings for the next two cycles.[37] The P/E ratio for HII, however, was based on that company's financial information for the fiscal year

---

[36]Mr. Heebink's testimony in rebuttal regarding the use of P/E ratios was somewhat confusing. He could not explain why these other items are necessarily important or how they might have influenced or changed Mr. Engstrom's conclusions. Mr. Heebink testified in the context of what an "acquirer" would consider in a "typical mergers-and-acquisitions situation", wherein he claims P/E ratios would seldom be used.

[37]This information was derived from Value Line Investment Survey, which uses the most recent 6-month period reported to the Securities & Exchange Commission and an estimate of the next 6-month period.

ending July 31, 1995. Petitioners claim that good appraisal practice requires use of the same period of time for the guideline companies and the subject company. We agree with petitioners that the preferable comparison of historical and/or projected earnings should be made using consistent time periods. However, petitioners do not explain how the use of consistent time periods in the instant case would change Mr. Engstrom's conclusions. Although this flaw in Mr. Engstrom's analysis leads us to question its persuasiveness, we are not convinced that it renders his analysis wholly erroneous.

Mr. Engstrom relied solely on HII's fiscal year 1995 financial information in making his conclusions. Fiscal year 1995 was a "banner year" for HII. It realized sales and net income exceeding the sales and net income that it realized in prior years. Petitioners contend that it was in error to rely solely on the fiscal year 1995 information. Respondent argues that use of the fiscal year 1995 information alone was justified because HII was experiencing strong growth, which HII's projections indicated would continue, and "it comports with common sense that more current information and expectations are more indicative of the value that an investor would place on stock than are historic earnings."

We might agree with respondent that the hypothetical buyer would give primary consideration to the most recent year's

financial information in purchasing stock of a company. However, we also believe that a hypothetical buyer would consider a company's historical earnings placing greater emphasis on relevant information from the more recent years. This is especially true of companies, such as HII, which are in cyclical industries and use the completed contract method of accounting. In these circumstances, the use of longer periods of time or averages over "a peak to trough sort of cycle" would seem preferable. Thus, we agree with petitioners that reliance solely on financial information for one particular year might overstate the fair market value of stock in a company. At the same time, reliance on more recent financial information might be justified in certain circumstances.[38] For example, Mr. Engstrom testified:

---

[38]We also point out that Rev. Rul. 59-60, sec. 4.02(d), 1959-1 C.B. at 241, states on the subject of future earning power:

> Potential future income is a major factor in many valuations of closely-held stocks, and all information concerning past income which will be helpful in predicting the future should be secured. Prior earnings records usually are the most reliable guide as to the future expectancy, but resort to arbitrary five-or-ten-year averages without regard to current trends or future prospects will not produce a realistic valuation. If, for instance, a record of progressively increasing or decreasing net income is found, then greater weight may be accorded the most recent years' profits in estimating earning power. * * *

Rev. Rul. 59-60, supra, "has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value". Estate of Newhouse v. Commissioner, 94 T.C. at

(continued...)

Well, with regard to these particular industries and with regard to Hess, I mean, even though they are in a cyclical industry, it appeared that they were going through a period of secular growth, which would mean a growth without regard to the normal patterns of the industry.

And, certainly, that's borne out in the growth rate of the company's sales, the growth rate of the company's earnings and the budget data regarding what expectations were for the future. So for this particular company, I don't think that it's appropriate to measure it over a period of years.

Under these circumstances, we cannot agree that Mr. Engstrom's use of the 1995 fiscal year information alone renders his analysis unreliable.[39] We are not convinced that his reliance on the 1995 financial information necessarily overstates the fair market value of HII stock. Nevertheless, we recognize this possibility and consider it in reaching our conclusions.

Petitioners also suggest that Mr. Engstrom should have made a downward adjustment to the P/E ratios to reflect the fact that HII's asset utilization (sales to total assets) was higher than that of the guidelines. In Mr. Heebink's market comparable analysis, he made a downward adjustment to reflect the differences in HII's asset utilization. According to Mr.

---

[38](...continued) 217.

[39]Mr. Heebink testified generally regarding the benefits and preferability of using longer periods for comparison and the potential of an overstatement when using financial information for only 1 year. However, he did not testify regarding whether the use of a longer period or averages would have affected Mr. Engstrom's conclusions.

Heebink, "Asset utilization affects earnings growth because a company with low asset utilization can increase earnings through more efficient management of assets."  Mr. Engstrom, on the other hand, made a 35-percent adjustment to the P/E ratio he derived from the guideline companies to account for the fact that the average net profit margin of the guideline companies was approximately 35 percent less than HII's net profit margin. According to Mr. Engstrom, "Companies with higher profit margins tend to have lower price/earnings ratios because it is more difficult for the company to achieve future growth."  We agree with respondent that these adjustments were designed to capture the same thing, HII's relative difficulty of achieving future growth.[40]  Thus, we cannot agree that Mr. Engstrom's analysis was flawed in this respect.

---

[40]Mr. Engstrom agrees that HII had a higher return on assets than the guideline companies; this results in greater risk, and normally this risk translates into a lower price earnings multiple.  However, Mr. Engstrom testified that this "was one of the primary issues that we addressed when we were looking at an appropriate price earnings multiple" for HII.  He further testified that he made two adjustments:

   One is the adjustment for size, and one's an adjustment
   for other factors.  And if you look at the text of our
   report, the primary motivation of that other adjustment
   factor was the fact that Hess's profit margins are
   higher than the guideline companies'.

   So it's taking account of the fact that their
   profitability is higher.  And whether you're measuring
   that profitability in terms of profit margins or in
   terms of returns on assets, it's higher, and therefore
   we would reduce the multiple.

Petitioners also claim that Mr. Engstrom erred in failing to consider HII's financial information for the most recent quarter before the gift of shares; i.e., the quarterly results for August to October 1995. We are not convinced that this was error. Indeed, petitioners' expert did not consider this information in his market comparable analysis. Also, Mr. Gaynor did not update his valuation for the gift tax returns to account for HII's performance after July 31, 1995. Further, Mr. Engstrom explained that a prospective buyer might ask questions regarding the more recent quarterly information, but would not consider a loss in that quarter overly alarming where the company uses the completed contract method of accounting.

Although we question certain aspects of Mr. Engstrom's guideline companies analysis, and we cannot agree that the value he derived under that analysis is entitled to the weight he gave it, i.e., 40 percent, we find that value provides at least some indication of the fair market value of HII stock. Indeed, it appears to us that the major separation in the value that Mr. Heebink derived in his market comparable analysis and in the value that Mr. Engstrom derived in his guideline companies analysis is attributable to the erroneous $2.5 million adjustment that Mr. Heebink made to cost of sales in his analysis. See supra note 23.

Discounted Cashflow Method

Mr. Engstrom considered the discounted cashflow method and determined that the fair market value of common stock in HII was $25,566,478, or $256,000 per share as of November 15, 1995. He concluded that this amount supported his conclusions with respect to his overall valuation analysis. Mr. Engstrom gave no weight to that amount because he concluded that relatively small changes in certain assumptions which were used resulted in large changes to the indicated value of the company.

We cannot agree that this provides a basis for wholly rejecting a discounted cashflow analysis. Indeed, as Mr. Heebink testified, this same problem is apparent in other valuation methods. It is axiomatic that even small changes in certain assumptions in a valuation analysis can result in dramatic changes in the value derived. Of course, in the case of certain companies, the distortions in value may be more pronounced. However, this does not preclude any reliance on a discounted cashflow analysis, and we would in those circumstances apply less weight to the value derived thereunder.[41]

_____

[41]Respondent argues on brief that "Mr. Engstrom's conclusion that the DCF method did not provide reliable information is completely correct * * *. Any conclusion reached using it should be disregarded." Respondent discussed Mr. Engstrom's discounted cashflow method in his reply brief; however, he considers any errors in that method "irrelevant", since Mr. Engstrom did not rely on the discounted cashflow method. It is clear to us that respondent places no reliance upon Mr. Engstrom's discounted

(continued...)

Other Items

In a letter of intent dated September 28, 1994, Dover Diversified proposed to purchase all the outstanding stock of HII for $44 million or approximately $393,000 per share. Throughout these proceedings, respondent has alluded to this letter of intent as evidence of the fair market value of HII stock.[42] However, we are not convinced that the proposed purchase price is a reliable indicator of the fair market value of HII stock. The letter of intent was not binding on the parties, and Dover Diversified decided not to purchase HII. It is not at all clear whether Dover Diversified conducted the type of investigation or due diligence which might produce a reliable value indicator. Neither petitioners' expert nor respondent's expert relied upon the letter of intent. Indeed, Mr. Engstrom testified:

> To the extent that there is an amount that was communicated in the letter of intent as a possible acquisition price, then, you know, possibly there's some valuation information. But, as we said in our report, we didn't place any reliance upon it. So it's pretty weak valuation information.

---

[41](...continued) cashflow method. We likewise give Mr. Engstrom's discounted cashflow analysis no weight.

[42]Respondent's position on this item is confusing. Considerable time was spent at trial and on brief regarding the letter of intent. However, respondent's expert did not rely upon that item, and respondent does not object to petitioners' requested finding of fact that "The Dover Diversified non-binding letter of intent is not a reliable indicator of the value of HII's stock."

We likewise do not rely upon the letter of intent.

At trial, Mr. Hess testified to a number of factors which petitioners argue a hypothetical buyer would have considered in purchasing shares of HII stock: (1) The trend toward the use of aluminum wheels was creating competition for HEI's steel wheel manufacturing customers; (2) the penetration of HEI's most prominent competitor, Fontijne, into the American market with the advantage of favorable exchange rates; (3) HEI's and Hess MAE's dependence on exclusive license agreements; (4) HII's continued problems with technical and sales employees;[43] (5) the costs to support HII's new sales and service organization in Switzerland; and (6) the scheduled retirement of Mr. Kucklick in February 1998. The experts discussed several of these items in their general discussions of the economy and the industry in which HII and its principal customers were involved. These items were factored into their various analyses, and we have considered them as part of our discussion relating thereto.[44]

---

[43]We note that petitioners' expert indicated that employee turnover had not been a significant problem.

[44]Other than Mr. Hess's testimony, we have no basis from which to conclude that the remaining factors were apparent at the time of the gift, whether they would have been considered by a hypothetical buyer, and to what extent these factors would affect the fair market value of HII stock.

Discounts

The parties and their experts agree that a 15-percent minority interest discount should be applied where appropriate to reflect the lack of control inherent in a minority interest in HII stock. They also agree that a marketability discount is appropriate to reflect the lack of a ready market for the HII stock on the gift date. However, they disagree as to the appropriate marketability discount to be applied: Mr. Heebink applied a 30-percent discount, and Mr. Engstrom applied a 25-percent discount.

Our review of Mr. Heebink's report shows a potential overlap and an apparent failure to make a proper separation between the lack of control and the lack of marketability apparent in a minority interest in HII. See Estate of Andrews v. Commissioner, 79 T.C. at 953 (explaining the difference between minority interest discount and marketability discount). Mr. Heebink states that "Minority interest shares are significantly less marketable and liquid than controlling interest shares because few investors are interested in minority interest investments in closely held companies", and he concludes:

> Considering that this valuation relates to a minority interest in a company with extensive owner involvement, significant technical expertise, high earnings and profitability variation, and above average automobile industry concentration, a 30% marketability and liquidity discount was selected for Hess Industries.

This potential overlap and the apparent failure to separate the minority interest and marketability discounts cause us to question Mr. Heebink's conclusion.  On the other hand, Mr. Engstrom's conclusion of a 25-percent marketability discount is reasonable under the circumstances of this case.  Where appropriate, we consider a 15-percent minority interest discount and a 25-percent marketability discount in determining the fair market value of HII stock.

Conclusion

The record reflects a range of values per share for HII stock, which we summarize as follows:

| | |
|---|---|
| Redemption analysis - Mr. Heebink[1] | $104,000 |
| Net asset value analysis - Mr. Engstrom[1] | 119,000 |
| Valuation analysis - Mr. Heebink[1] | 128,000 |
| Guideline companies analysis - Mr. Engstrom[2] | 219,000 |
| Prior redemption transaction - Mr. Engstrom[3] | 329,500 |
| Stockholders agreement - Mr. Engstrom[3] | 380,000 |

[1]Minority interest and marketability discounts applied.
[2]Marketability discount applied only.
[3]No discounts applied.

Because valuation necessarily results in an approximation, the valuation figure we determine need not be one as to which there is specific testimony as long as it is within the range of values that may properly be arrived at from consideration of all the evidence.  See Estate of Magnin v. Commissioner, T.C. Memo. 2001-31.  After considering all the evidence, the values that petitioners' and respondent's experts derived in their various analyses, other factors, and appropriate minority interest and

marketability discounts, we find that the value of HII stock falls somewhere in the middle of this range of values. We hold that the value of the shares of HII stock that were gifted on November 15, 1995, was $200,000 per share.

<u>Decision will be entered</u>

<u>under Rule 155</u>.